Joe BENHAM, et al.,
Plaintiffs-Appellants,

v.

James LEDBETTER, et al.,
Defendants-Appellees.

No. 85–8388.

United States Court of Appeals,
Eleventh Circuit.

March 21, 1986.

Phyllis J. Holmen, Atlanta, Ga., for plaintiffs-appellants.

Carol A. Cosgrove, Asst. Atty. Gen., Atlanta, Ga., for defendants-appellees.

Before RONEY and HATCHETT, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

HATCHETT, Circuit Judge:

█ In this appeal, we affirm the district court's holding that the Georgia statutory scheme for release of persons committed to mental institutions following acquittal for a criminal offense by reason of insanity is constitutional.

## I. Background

### A. Procedural Overview

This class action challenges the Georgia procedures governing the release of persons involuntarily committed to Georgia mental hospitals after being acquitted of criminal charges by reason of insanity. The plaintiffs filed the lawsuit in 1980 pursuant to 42 U.S.C.A. § 1983 (West 1981). The district court certified a class on September 2, 1980, pursuant to Fed.R.Civ.P.

23(b)(2) as consisting of "all persons who are, or will be, confined in mental hospitals pursuant to Ga.Code 27–1503 (Ga.Laws 1977, pp. 1293, 1295–96, § 2) following findings of not guilty by reason of insanity." The class obtained much of the relief it sought from the district court and from a panel of this court. *See Benham v. Edwards*, 501 F.Supp. 1050 (N.D.Ga.1980) (*"Benham I"*); *Benham v. Edwards*, 678 F.2d 511 (5th Cir. Unit B 1982) (*"Benham II"*).[1] As explained below, the Supreme Court vacated the holdings of *Benham II* and remanded to the Eleventh Circuit. This court remanded to the district court, which denied relief.

Since the case was originally filed, the Georgia Legislature has amended the commitment procedures for insanity acquittees.[2] As a result, all members of the plaintiff class have had commitment hearings before being committed to Georgia state mental health facilities. In this appeal, the plaintiff class does not raise any issues concerning the commitment procedures for insanity acquittees in Georgia. The plaintiff class challenges various aspects of the release procedures for persons committed pursuant to the Georgia Mental Health Code after being acquitted of a criminal charge by reason of insanity.

As of March 31, 1984, the plaintiff class of insanity acquittees in state mental health facilities totaled 91. James Ledbetter is Commissioner of the Georgia Department of Human Resources and Robert L. Pulliam is Superintendent of the Northwest Georgia Regional Hospital. Ledbetter and Pulliam were automatically substituted as party defendants as successors to persons who held their offices at the time of filing of the lawsuit. *See* Fed.R.Civ.P. 25(d).

In *Benham II,* this court declared portions of the Georgia commitment and release provisions unconstitutional. The

---

* Honorable Philip Nichols, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. On October 1, 1981, the Fifth Circuit, Unit B became the Eleventh Circuit.

2. In this opinion, an insanity acquittee is one who has been acquitted of a crime by reason of insanity and is in custody. A M.H.C. committee is one who is confined on the basis of having been found by a court to meet the state's civil commitment criteria pursuant to the code and without having committed a criminal offense.

court affirmed in part and reversed in part the judgment of the District Court for the Northern District of Georgia in *Benham I,* which found Georgia O.C.G.A. 17–7–131 unconstitutional in several respects. After the appeals court issued its decision, the state of Georgia amended the statute and filed a petition for writ of certiorari with the United States Supreme Court. The Supreme Court granted the writ and vacated and remanded the case in light of its decision in *Jones v. United States,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). *Ledbetter v. Benham,* 463 U.S. 1222, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983). This court remanded to the district court, which found that in light of *Jones* and this court's decision in *Williams v. Wallis,* 734 F.2d 1434 (11th Cir.1984), the reasoning supporting a finding that the Georgia release statute was unconstitutional could no longer be sustained.

### B.  Current Georgia Law

The current statutory scheme is as follows. (See Appendix for insanity acquittee statutes discussed in this opinion.) When a defendant in a criminal case is found not guilty by reason of insanity, the trial court is required to commit the person to a state mental health facility for an evaluation for a period not to exceed thirty days.[3] O.C.G.A. § 17–7–131(d). At the end of the thirty-day period, facility officials must report to the court whether the individual meets the criteria for civil commitment. The criteria for civil commitment are set forth as follows at O.C.G.A. § 37–3–1(12):

"Mentally ill person requiring involuntary treatment" means a person who is mentally ill and (A) who presents a substantial risk of imminent harm to himself or others, as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to himself or to other persons, or (B) who is so unable to care for his own physical health and safety as to create an imminently life-endangering crisis.

The court may discharge the person or, if the state alleges that the person meets the criteria for civil commitment, a commitment hearing must be held. The court may take judicial notice of evidence introduced during the criminal trial and may require testimony from any other person with knowledge of the acquittee's condition. The insanity acquittee is provided with substantial rights at the commitment hearing, including the right to confront and cross-examine witnesses, the right to have appointed counsel, and the right to obtain an independent psychiatric examination at the acquittee's expense. O.C.G.A. § 17–7–131(e).

The issue before the committing court is whether the acquittee is "currently a mentally ill person in need of involuntary treatment or currently mentally retarded and in need of being ordered to receive services, as those terms are defined by paragraph (12) of Code Section 37–3–1 and Code Section 37–4–40." O.C.G.A. § 17–7–131(e). The statute is silent on who bears the burden of proof and on the standard of proof at the commitment hearing. Persons committed pursuant to the Mental Health Code must meet the same commitment criteria, but the procedures for establishing that they meet the criteria are different. A Mental Health Code (M.H.C.) committee must receive a "full and fair hearing" in which the party seeking to have treatment administered must prove by clear and convincing evidence that the person requires involuntary treatment. O.C.G.A. § 37–3–1(8). The initial commitment is limited to six months under O.C.G.A. § 37–3–81(d), and subsequent commitment orders are limited to one year. O.C.G.A. § 37–3–83(i).

The only way an insanity acquittee may gain release is by application to the committing court for approval for release. O.C.G.A. § 17–7–131(f). The acquittee must overcome the presumption that he or she meets the criteria for involuntary commitment. The insanity acquittee must bear the burden of proof. O.C.G.A. § 17–7–131(f)(2). If the finding of the court is

---

**3.** The criteria for acquittal by reason of insanity are set forth at O.C.G.A. § 17–7–131(a)(1).

adverse, neither the acquittee nor the hospital may petition the committing court for release of the patient for twelve months. O.C.G.A. § 17–7–131(f)(3).

On the other hand, an M.H.C. committee, at the expiration of a commitment order, is again entitled to a "full and fair hearing" at which the state seeks "recommittal." The state bears the burden of showing by clear and convincing evidence that the M.H.C. committee meets the involuntary commitment criteria. The state does not receive the benefit of a presumption of continued mental illness and dangerousness. Hospital officials may release an M.H.C. committee at anytime, without court approval, if they conclude that the committee does not meet the commitment criteria.

An M.H.C. committee also has full recourse to habeas corpus proceedings. O.C.G.A. § 37–3–148. If an M.H.C. committee wishes to challenge the legality of his or her involuntary detention in a habeas corpus proceeding, the committee bears the burden of showing by a preponderance of the evidence the illegality of the detention. *See, e.g., Jones v. Leverett*, 230 Ga. 310, 196 S.E.2d 885 (1973) (prisoner petition). The habeas corpus remedy is unlimited in frequency for an M.H.C. committee.

### C.  *Benham II*

In *Benham II*, the court discussed the commitment provisions, since amended, and the release provisions of the Georgia statute, which remain substantially the same. The court now has before it the new statute and new guidance from the Supreme Court. In *Benham II*, we reviewed the older statute, and made several holdings. First, we held that the application of a presumption of continuing insanity in all legal proceedings against an insanity acquittee subsequent to acquittal violates the equal protection clause. *Benham II*, 678 F.2d at 517. Second, we held that at the end of a thirty-day evaluation period, Georgia must provide insanity acquittees the same state-initiated commitment hearing that it provides for M.H.C. committees.

*Benham II*, 678 F.2d at 521. Third, we held that the state must bear the burden of proving the commitment criteria by clear and convincing evidence. *Benham II*, 678 F.2d at 528. Fourth, we held that under the narrowing construction of *Clark v. State*, 245 Ga. 629, 266 S.E.2d 466 (1980), "no members of this class of acquittees [existed] for whom requiring court approval for release does not serve the State's interests." *Benham II*, 678 F.2d at 537. The court concluded that the only persons required to obtain court approval for release were those acquittees who had displayed dangerousness and mental illness revealed through criminal conduct. Therefore, the state's interest in invoking the judiciary's expertise in criminal matters was implicated. *Benham II*, 678 F.2d at 537. Fifth, we held on "due process grounds and on equal protection grounds that Georgia could not place the burden of proving the release criteria on insanity acquittees while simultaneously providing that the state must bear the burden of proof with respect to the release of M.H.C. committees." *Benham II*, 678 F.2d at 541. Sixth, we held that a limitation on the frequency of release applications by insanity acquittees lacks any rational basis. *Benham II*, 678 F.2d at 542.

The class raises in this appeal four challenges to the current statutory scheme for release of insanity acquittees. The class contends that the requirement of judicial approval for release, the limitation on successive release applications, the presumption of continuing mental illness, and the imposition of the burden of proof on the insanity acquittee each violates equal protection and due process. Each of these requirements is more burdensome than the release provisions for Mental Health Code committees.

### II.  *Jones v. United States*

The decision of the Supreme Court in *Jones v. United States* concerned a narrow question. In *Jones*, the petitioner sought release after being confined for seventeen months for the crime of petit larceny, a misdemeanor for which the maximum pris-

on sentence is one year. The petitioner had been automatically committed to a mental hospital under District of Columbia law providing for automatic commitment of one acquitted solely on the grounds of insanity at the time of the offense. The petitioner had then failed to meet his burden of proof at the District of Columbia's fifty-day "release" hearing at which he had the burden of proving by a preponderance of the evidence that he was no longer mentally ill or dangerous. *Jones*, 463 U.S. at 356–57, 103 S.Ct. at 3045–46, 77 L.Ed.2d at 700–701. He did not thereafter seek to avail himself of the usual procedures of a release hearing, to which he was entitled every six months by District of Columbia law. *Jones*, 463 U.S. at 363 n. 11, 103 S.Ct. at 3049 n. 11, 77 L.Ed. at 704 n. 11. Instead, he sought release at the end of seventeen months on the grounds that his automatic original commitment—not the fifty-day hearing,—did not comport with due process; he further asserted that confinement beyond the one-year maximum for the crime could not be justified by the state's only conceivable legitimate justification for automatic commitment. *Jones*, 463 U.S. at 362–63, 103 S.Ct. at 3048–49, 77 L.Ed.2d at 704. He asserted he should either be released unconditionally or recommitted under the District of Columbia civil commitment procedures. *Jones*, 463 U.S. at 362–63, 103 S.Ct. at 3048–49, 77 L.Ed.2d at 704.

The Supreme Court rejected these contentions. The Court did not address the provisions for release of insanity acquittees. *Jones*, 463 U.S. at 363 n. 11, 103 S.Ct. at 3049 n. 11, 77 L.Ed.2d at 704 n. 11. Three conclusions supported the Supreme Court's rejection of Jones's petition. First, the Court reasoned that a finding of insanity at the criminal trial is sufficiently probative of mental illness and dangerousness to justify automatic commitment without another commitment hearing. *Jones*, 463 U.S. at 363–64, 103 S.Ct. at 3049, 77 L.Ed.2d at 705. Second, the Court rejected Jones's contention that his indefinite commitment was unconstitutional because the proof of his insanity was by a preponder-

ance of the evidence rather than by clear and convincing evidence as required for civil commitment by *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The Court found "good reason for diminished concern as to the risk of error" where an insanity acquittee has advanced insanity as a defense and proven that his or her criminal act was a product of mental illness. The Court emphasized the flexibility of due process. *Jones*, 363 U.S. at 367–68, 103 S.Ct. at 3051, 77 L.Ed.2d at 707. Third, the Court rejected the contention that the length of the confinement should in no event exceed the maximum period for incarceration under the criminal statute. The Court's rationale was that confinement rests on continuing illness and dangerousness and not on punishment; therefore, the length of the criminal sentence bears no relation to the purposes of commitment. *Jones*, 363 U.S. at 369–70, 103 S.Ct. at 3052, 77 L.Ed.2d at 708.

In light of the limited question presented and the emphasis the Court placed on the flexibility of due process analysis, *Jones* does not give direct answers for the issues presented in this case. It does, however, provide guidance. First, *Jones* directs attention to the due process clause as the relevant inquiry where petitioners challenge different treatment of insanity acquittees and civil committees on both equal protection and due process grounds. Second, *Jones* describes the kinds of rationales that might support procedural limitations on the release of committed insanity acquittees. Because the *Jones* rationales are directed only to the automatic commitment in the District of Columbia and the claim that the maximum sentence should limit the length of confinement, *Jones* must be used cautiously in analyzing Georgia's procedures for releasing insanity acquittees.

### III. *Analytic Framework*

#### A. Equal Protection

██ The class places heavy reliance on its claim that the differences in Georgia's release procedures for M.H.C. committees and insanity acquittees violate the equal

protection clause. Because Georgia has chosen to treat the two groups alike for purposes of commitment, the class contends that the state fails to offer any rational basis for the differences in release procedures. The class contends that once Georgia merges the groups, it may not subsequently treat them differently. More particularly, the class points out that under the amended law, a person acquitted of a nondangerous crime that does not in itself meet the commitment criteria may be committed if other evidence is introduced establishing that the insanity acquittee meets the civil commitment criteria. The class contends that placing special procedural barriers in the way of release of committed insanity acquittees whose crimes were not "serious, violent" crimes is irrational. The class contends that thirty-four persons are presently confined who do not meet the commitment criteria, and that of these, several were acquitted of crimes that were not "serious, violent" crimes.

In *Jones*, the majority and the minority agreed that the equal protection argument essentially duplicated the due process argument on the facts of that case. The court addressed the arguments in terms of the Due Process Clause. The majority explained: "If the Due Process Clause does not require that an insanity acquittee be given the particular procedural safeguards provided in civil commitment hearings under *Addington*, then there necessarily is a rational basis for equal protection purposes for distinguishing between civil commitment and commitment of insanity acquit-

tees." *Jones*, 363 U.S. at 362 n. 10, 103 S.Ct. at 3048 n. 10, 77 L.Ed.2d at 704 n. 10. In dissent, Justice Brennan commented that "under our current understanding of the meaning of these clauses it is perhaps more appropriate to focus primarily on due process considerations." *Jones*, 363 U.S. at 375 n. 5, 103 S.Ct. at 3055 n. 5, 77 L.Ed.2d at 712 n. 5 (dissent).[4]

Because due process requires Georgia to tailor each provision of its release statute to satisfy the "specific dictates of due process," the avenue for attacking the soundness of procedural barriers to release of insanity acquittees is flexible due process analysis, set out in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

We conclude that the equal protection claim duplicates the due process claim. We therefore address appellants' arguments primarily in terms of the due process clause. *Jones*, 363 U.S. at 362 n. 10, 103 S.Ct. at 3048 n. 10, 77 L.Ed.2d at 704 n. 10.

### B. Due Process

The starting point for an analysis of due process is a recognition that confinement to a mental institution against one's will is a deprivation of liberty. *Addington*, 441 U.S. at 425, 99 S.Ct. at 1809 (1979). (Citing *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972)). One element of the deprivation is peculiar to an initial commit-

---

4. Ely's discussion of the rational basis test compared with heightened scrutiny is helpful in applying the Supreme Court's point that the equal protection analysis and the due process analysis merge. Ely explains that in a rational basis test, the government may invoke any rational reason. J.H. Ely *Democracy and Distrust A Theory of Judicial Review*, 245 n. 38 (1980). If the only reason the state is able to offer is constitutionally infirm, the classification must fail.

Here, the potentially infirm reason is a refusal to extend due process to insanity acquittees. If the release requirements for insanity acquittees do not violate due process guarantees, they are necessarily rationally based on permissible goals. On the other hand, if the scheme fails

due process analysis, no number of other rational purposes can save it. Therefore, where due process is implicated, an equal protection challenge essentially restates the claim that the legislature has infringed a liberty interest. An equal protection challenge in which no due process claim is alleged "stands on its own" (363 U.S. at 362 n. 10, 103 S.Ct. at 3048 n. 10, 77 L.Ed.2d at 704 n. 10), as the class notes, but it also must bear the heavy burden of demonstrating the lack of a rational basis for treating civil committees and insanity acquittees differently after the requirements of due process have been met. *See Jones*, 363 U.S. at 362 n. 10, 103 S.Ct. at 3048 n. 10, 77 L.Ed.2d at 704 n. 10 (rejecting independently stated equal protection claim).

ment decision. "Involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual." *Addington*, 441 U.S. at 426, 99 S.Ct. at 1809–10. In a civil commitment hearing, the state must guard against the possibility that "a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct." *Addington*, 441 U.S. at 427, 99 S.Ct. at 1810. The loss that comes from an erroneous decision to civilly commit a person is so grave that due process requires proof more substantial than a mere preponderance of the evidence. *Addington*, 441 U.S. at 427, 99 S.Ct. at 1810.

Once committed, a person retains a liberty interest, though not the interest of the civil committee candidate in avoiding stigma.[5] *Jones*, 363 U.S. at 367 n. 16, 103 S.Ct. at 3051 n. 16, 77 L.Ed.2d at 707 n. 16. If an involuntary commitment is initially permissible, it cannot constitutionally continue after the basis for it no longer exists. *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975) (not addressing whether state may compulsorily confine a nondangerous, mentally ill individual for the purpose of treatment). In analyzing the state's interest in confining persons involuntarily to a mental hospi-

tal, the Supreme Court has said "the State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others." *Addington*, 441 U.S. at 426, 99 S.Ct. at 1809. The Supreme Court recognizes this principle in *Jones* as it applies to insanity acquittees in approving automatic commitment because the fifty-day hearing provides a prompt opportunity for an insanity acquittee to obtain release if the insanity acquittee has recovered. 363 U.S. at 366–67, 103 S.Ct. at 3051, 77 L.Ed.2d at 706. Under *Jones*, "the committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous." *Jones*, 363 U.S. at 369, 103 S.Ct. at 3052, 77 L.Ed.2d at 708.

If mental illness and dangerousness could be established to a scientific certainty, these legal principles might mandate the same process for determining when an insanity acquittee is entitled to be released as M.H.C. committees receive. In *Jones*, however, the Court rejected "the suggestion that Congress's power to legislate in this area depends on the research conducted by the psychiatric community." 363 U.S. at 364–65 n. 13, 103 S.Ct. at 3049–50 n. 13, 77 L.Ed.2d at 705 n. 13. How to strike the due process balance was made a matter

---

**5.** In *Benham I* the district court stated that confinement of an individual in a psychiatric hospital involves a "massive curtailment of liberty." 501 F.Supp. at 1060. (Citing *Humphrey v. Cady*, 405 U.S., 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1971)). In his *Jones* dissent, Justice Brennan refers to "the massive intrusion on individual liberty that involuntary psychiatric hospitalization entails." *Jones*, 363 U.S. at 372, 103 S.Ct. at 3053–54, 77 L.Ed.2d at 710. Our understanding of the liberty interest at stake in this litigation, as framed by the class, derives from *Addington*. The interest of a class member is simply to be free from commitment when the state no longer has a valid purpose for holding the person. Nevertheless, we quote Justice Brennan's dissent to show one view of the liberty interest at stake on the part of anyone involuntarily confined to a mental hospital.

In many respects, confinement in a mental institution is even more intrusive then incarceration in a prison. Inmates of mental institutions, like prisoners, are deprived of unrestricted association with friends, family, and

community; they must contend with locks, guards, and detailed regulation of their daily activities. In addition, a person who has been hospitalized involuntarily may to a significant extent lose the right enjoyed by others to withhold consent to medical treatment. The treatments to which he may be subjected include physical restraint such as straightjacketing, as well as electroshock therapy, aversive conditioning, and even in some cases psychosurgery. Administration of psychotropic medication to control behavior is common. Although this court has never approved the practice, it is possible that an inmate will be given medication for reasons that have more to do with the needs of the institution than with individualized therapy. We should not presume that he lacks a compelling interest in having the decisions to commit him and to keep him institutionalized made carefully, and in a manner that preserves the maximum degree of personal autonomy.

363 U.S. at 385–86, 103 S.Ct. at 3061, 77 L.Ed.2d at 719 (citations omitted).

of lay judgment.[6] In exercising this judgment, legislatures may take into account the facts established by a verdict of not guilty by reason of insanity—that because of mental illness, the defendant has committed an act that constitutes a criminal offense. *Jones*, 363 U.S. at 364, 103 S.Ct. at 3049, 77 L.Ed.2d at 705.

*Mathews v. Eldridge* provides the guidelines for determining the process required to protect the liberty interests of committed acquittees. 424 U.S. at 335, 96 S.Ct. at 903. The first of the three considerations is the private interest at stake. The second is the risk of erroneous deprivation of the interest and the probable value of additional procedural safeguards. *Jones* concludes that a conviction gives a good reason for diminished concern about the risk of error at the initial commitment stage. The fact that a person has been found beyond a reasonable doubt to have committed a criminal act indicates dangerousness. *Jones*, 363 U.S. at 364, 103 S.Ct. at 3049, 77 L.Ed.2d at 705 (citing *Lynch v. Overholser*, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962)).

In *Mathews*, the second factor is stated as the risk of erroneous deprivation of a private interest. 424 U.S. at 335, 96 S.Ct. at 903. The relative lack of confidence in scientific diagnoses of mental illness and prediction of dangerousness alters somewhat the traditional due process concern with accuracy, which customarily is meant to protect the individual interest. In *Addington*, the Supreme Court described the function of legal process as "minimizing the risk of erroneous *decision*." 441 U.S. at 425, 99 S.Ct. at 1809. (Citing *Mathews*) (emphasis added). In the context of the insanity defense, therefore, the second *Mathews* factor serves both the state's and the insanity acquittee's interest in an accurate decision.

The government has a variety of interests at stake when the insanity defense is raised. The lack of knowledge about "mental illness and social accountability for the acts of mentally ill persons" calls for efforts by the states to "work their way to an acceptable solution to a complex problem." *Benham II*, 678 F.2d at 543 (Roney, J., dissenting). A legislature might conclude that public confidence in the integrity of the insanity defense would be undermined if the legislature delegated release decisions to medical professionals. Likewise, the legislature might find that public confidence would be undermined if a successful plea of insanity were viewed as lacking probative force in decisions about continuing mental illness and public safety. It has also been suggested that a legislature may appropriately attach various consequences to an insanity defense "in order to discourage false pleas of insanity." *Lynch v. Overholser*, 369 U.S. 705, 715, 82 S.Ct. 1063, 1069–70, 8 L.Ed.2d 211 (1962) (Harlan, J.). The Second Circuit has cited the danger of calculated abuse of the insanity defense as a relevant consideration in designing procedures for committing an insanity acquittee. *Warren v. Harvey*, 632 F.2d 925, 932 (2d Cir.1980). The state also has an interest in protecting society from the insanity acquittee's potential dangerousness. *Jones*, 363 U.S. at 369, 103 S.Ct. at 3052, 77 L.Ed.2d at 708. The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act indicates dangerousness. *See Jones*, 363 U.S. at 363–64, 103 S.Ct. at 3649, 77 L.Ed.2d at 705. The state has an interest in invoking the judiciary's expertise in criminal matters. *Benham II*, 678 F.2d at 537. In *Jones*, "the Government's strong interest in avoiding the need to conduct a de novo commitment hearing following every insanity acquittal" was accorded

---

**6.** The lack of certainty in diagnoses of mental illness refutes the suggestion by the class that the only possible explanation for the procedural barriers to a committed acquittee's release is an impermissible punitive purpose. This argument assumes that an unwillingness to defer to professional judgment about a committed acquit-

tee's recovery from mental illness is equivalent to a decision to treat a healthy person as a sick person. *Jones* recognizes that lay opinion, in the form of reasonable legislative judgments, may take account of the "tentativeness of professional judgment" in the field of mental illness and the insanity defense. 678 F.2d at 705 n. 13.

weight. *Jones,* 363 U.S. at 366, 103 S.Ct. at 3050, 77 L.Ed.2d at 706.

The emphasis in *Jones* on the flexibility of due process requires us to examine each of the *Mathews* factors in regard to the four challenged features of the Georgia statute.

## IV. *Discussion*

### A. Judicial Approval

■ In *Benham I,* the district court held that Georgia could only require judicial approval of insanity acquittees who had committed "serious violent crimes." 501 F.Supp. at 1072. This court vacated that portion of the district court's order. The *Benham II* court concluded that under *Clark v. State,* 245 Ga. 629, 266 S.E.2d 466 (1980), only insanity acquittees who met the "good cause" test of the statute were sent to a mental hospital after acquittal for evaluation. The court read good cause to narrow the class of insanity acquittees sent to the hospital to those who are dangerous. The class now contends that the amendment of the committing process has undermined the reasoning of the court in *Benham II.* Under the new scheme, all defendants found not guilty by reason of insanity are committed automatically for an evaluation in a state mental health facility. From that point, the substantive standard for committing them to a mental hospital is the same as for an M.H.C. committee (even though the procedures are different). As a result, persons not convicted of violent or dangerous crimes may be committed and required to obtain judicial approval for release. In contrast, M.H.C. committees may be released at any time on the judgment of a hospital official. The class maintains that this is an irrational difference in treatment. The class concludes that a person convicted of a nondangerous crime should be releasable from commitment on the judgment of the hospital officials. The plaintiff class attempts to distinguish the Ninth Circuit's approval of the requirement of judicial approval for the release of committed acquittees on the basis that the Ninth Circuit was reviewing a statute that required a strong showing of potential violence for commitment. *See Hickey v. Morris,* 722 F.2d 543 (9th Cir. 1983).

We have concluded that an equal protection challenge cannot invalidate the Georgia scheme if it meets the requirements of due process. In addition, the former Fifth Circuit has held that the requirement of judicial approval before a Florida insanity acquittee could be released does not violate equal protection. *Powell v. State of Florida,* 579 F.2d 324, 334 (5th Cir.1978). The class argues that *Powell* only approves judicial involvement where the crime charged is a serious, violent crime. (Citing *Benham I,* 678 F.2d at 533 n. 36.) Even if equal protection analysis had independent vitality in this challenge, the *Jones* conclusion that a finding beyond a reasonable doubt that a person committed a nonviolent crime indicates dangerousness would negate this argument.

We therefore turn to the due process claim. The class argues as follows. In Georgia, the criminal offense does not provide a basis for concluding that an insanity acquittee is either mentally ill or violent. The commitment is based on the civil commitment criteria. The class argues that the hospital is uniquely suited to judge whether the committed acquittee continues to meet the civil commitment criteria. *Cf. Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); *Williams v. Wallis,* 734 F.2d 1434, 1439 (11th Cir.1984). The class contends that when professionals make the judgment that the insanity acquittee does not meet the civil commitment criteria, Georgia has no further interest in restricting the person's liberty. Therefore, the class concludes that the person is entitled to be released without judicial intervention. The class also argues that the requirement of a hearing imposes an unnecessary burden on the state in contravention of the principles of *Mathews v. Eldridge.* The class argues that *Mathews* approves additional procedural safeguards for the purpose of avoiding an erroneous deprivation of liberty. In effect, the class argues that Georgia is using additional pro-

cedure to unfairly allocate the risk of error on the class—or in Justice Brennan's view of *Jones*, to force the insanity acquittee for the rest of his or her life to share equally with society the risk of error. *Jones*, 363 U.S. at 378, 103 S.Ct. at 3057, 77 L.Ed.2d at 714 (dissent).

In an earlier case, this court "express[ed] no opinion on whether ... a completely adversarial scheme would comport with due process." *Williams*, 734 F.2d at 1440 n. 6 (11th Cir.1984). In *Williams*, the court held that Alabama's nonadversarial procedures for release do not create an undue risk of erroneous deprivation of the insanity acquittee's liberty interest. 734 F.2d at 1438. The court also held that Alabama's imposing the burden of proof on an acquittee in a habeas corpus hearing entails little risk of erroneous deprivation of an acquittee's liberty. *Williams*, 734 F.2d at 1440. The court thought that compared with a completely adversarial scheme, the Alabama procedures had a low risk of error. *Williams*, 734 F.2d at 1440 n. 6. Here we are asked to conclude that judicial involvement increases the risk of error and poses a threat to liberty.

Judicial process has never been conceived as a threat to liberty in our system of independent courts. *Mathews* contains language that suggests that full judicial process may be counterproductive or inefficient, but the approval of legislative experimentation with efficient procedures falls short of supporting a conclusion that court supervision may violate due process. In approving a nonadversarial primary scheme for release in Alabama, the *Williams* court reasoned that an adversary procedure would be of little benefit to inmates. The court was careful to indicate that its skeptical language about adversary proceedings was intended only to highlight the low risk of error in Alabama's procedures, not to indicate any opinion at all on the constitutionality of a completely adversarial scheme. *Williams* thus does not stand for a disapproval or questioning of a completely adversarial release procedure, and it also does not stand for treating professional judgment as final. In *Wil-*

*liams*, the availability of a court forum through habeas corpus served as an outlet from medical judgment as the exclusive basis for a decision to continue confinement. 734 F.2d at 1440. Habeas corpus was a "secondary or backup procedure, a safeguard." 734 F.2d at 1440. The *Williams* view of court process as a safeguard thus reflects the generally shared lack of confidence in the absolute reliability of medical judgments in this area.

The argument that the Georgia statute is a misapplication of the *Mathews* balancing principles has some logic. In this area, however, we have noted that the *Mathews* concern with accuracy is of a special character. Both the state and the committed acquittee have an interest in a correct decision. *Compare Addington*, 441 U.S. at 425, 99 S.Ct. at 1809, discussed above. The *Jones* Court has suggested that it may not be inappropriate to ask the insanity acquittee "to share equally with society the risk of error." *Jones*, 363 U.S. at 367, 103 S.Ct. at 3051, 77 L.Ed.2d at 707 (distinguishing *Addington*, 441 U.S. at 427, 99 S.Ct. at 1810). The state has an interest in invoking the judiciary's expertise in criminal matters. *Benham II*, 678 F.2d at 537. Georgia may properly conclude that judicial involvement in the decision whether to release an insanity acquittee helps to balance fairly the risk of error between society and the insanity acquittee.

**B.  Presumption of Continuing Insanity**

■ In *Benham II*, the court did not address the use of a presumption of continuing insanity at the release hearing. The court held that no rational basis existed for imposing such a presumption on an insanity acquittee at a commitment hearing where no similar presumption applied to M.H.C. committees. *Benham II*, 678 F.2d at 517–19.

The class now argues that no rational basis exists for imposing such a presumption at the release hearing for insanity acquittees. The class argues that a substantial period of time will have elapsed

since the commitment; therefore, the conclusion of *Jones*, "that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment," dissolves after an insanity acquittee receives treatment. Again we reject the equal protection claim that a difference between the burden on M.H.C. committees and insanity acquittees lacks a rational basis independently of any due process infirmity. Under *Jones*, the rational reason for imposing a presumption on insanity acquittees is the conclusion that a finding beyond a reasonable doubt that a person committed a nonviolent crime indicates dangerousness. *Jones*, 363 U.S. at 364, 103 S.Ct. at 3049, 77 L.Ed.2d at 705.

For the due process analysis, a better understanding of the statutory presumption is necessary. Georgia has a rebuttable presumption that a mental condition, once proven, is presumed to continue unless shown otherwise. O.C.G.A. § 24–4–21 (former Georgia Code Ann. § 38–118). Once a criminal defendant proves insanity at a criminal trial, the presumption arises that the person's insanity or mental illness still exists unless he can show otherwise. *Clark v. State*, 245 Ga. at 631, 266 S.E.2d 466. The court may rely on the presumption at both the commitment and the release hearing notwithstanding expert opinion to the contrary. *Moses v. State*, 245 Ga. 180, 181, 263 S.E.2d 916 (1980), *cert. denied*, 449 U.S. 849, 101 S.Ct. 138, 66 L.Ed.2d 60 (1981). Because it is characterized as opinion evidence, the court can ignore unanimous medical testimony that the insanity acquittee does not meet the commitment criteria. *Pitts v. State*, 151 Ga. App. 691, 261 S.E.2d 435 (1979). If the insanity acquittee does not come forth with the evidence to rebut the presumption, the court must find that the insanity acquittee meets the commitment criteria.

The class argues that for this presumption to pass muster under the due process

clause, it must be shown with "substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." *Leary v. United States*, 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969). The class concludes that the state must establish with substantial assurance that it is more likely than not that a person continues to meet the civil commitment criteria.

In *Jones*, Justice Powell stated that the "precise evidentiary force of the insanity acquittal may vary from case to case, but the due process clause does not require Congress to make classifications that fit every individual with the same degree of relevance." *Jones*, 363 U.S. at 365–66, 103 S.Ct. at 3050, 77 L.Ed.2d at 706. Thus, despite our sense of caution in applying the *Jones* holding to an insanity acquittee in release hearings held years after the criminal act, we see no empirical basis offered by the class that this presumption is so irrelevant to some members of the class as to violate the due process clause.[7] The *Leary* case cited by the class concerns a criminal statutory presumption. Even so, "in the judicial assessment the congressional determination favoring the particular presumption must weigh heavily." *Leary*, 395 U.S. at 36, 89 S.Ct. at 1548.

We are sensitive to the bases for distinguishing the *Jones* presumption from the Georgia presumption. In particular, the due process balance is not the same. As noted, *Jones* gave weight to the government's interest in avoiding the need to conduct another commitment hearing following every insanity acquittal, at which "the new proceeding likely would have to relitigate much of the criminal trial," rather than "focusing on the critical question whether the acquittee has recovered." 363 U.S. at 365–66, 103 S.Ct. at 3050, 77 L.Ed.2d at 706. This government interest in avoiding an unproductive relitigation of

---

7. The class argues that the presumption flies in the face of facts found by the district court in *Benham I*, 501 F.Supp. at 1068 (citing deposition of Dr. Timothy Bullard). The court found that "the literature emanating from the medical pro-

fession indicates that the presumption is not based on valid scientific evidence." 501 F.Supp. at 1068. The rationale of *Jones* invalidates this factual holding of *Benham I*.

the criminal case helped to justify use of the common sense inference that an insanity acquittee is mentally ill at the time of acquittal.

Here, in contrast, the focus of the release hearing is the mental state of the insanity acquittee. The evidence would concern the patient's response to treatment. The practical need to presume continuing mental illness has dissipated. The government is expending resources in holding a hearing. The *Jones* justification of avoiding unproductive processes is absent.

The question is a close one. We conclude that a presumption of continuing insanity at a release hearing meets the *Mathews* due process standard. The original rationale of *Benham I* that the presumption is "scientifically unsupported" is no longer viable. *See Benham I,* 501 F.Supp. at 1070. In light of the lessened liberty interest of an insanity acquittee as compared with a candidate for civil commitment and the substantial state interest in lay control over the consequences of the insanity defense, we cannot say that Georgia has erred in imposing a presumption of continuing insanity on those who successfully invoke the insanity defense.

In holding that Georgia may impose a presumption of continuing insanity at a release hearing, we do not approve every implication of Georgia case law about the presumption. In particular, we doubt that due process is consistent with a presumption that cannot be rebutted by any amount of uncontradicted evidence, as suggested in *Pitts v. State,* 261 S.E.2d at 437–38. If no amount of evidence offered at a release hearing by an insanity acquittee could rebut the presumption of insanity, the processes of proof in the due process hearing would be an empty ritual. The sole basis for argument would be an appeal to judicial discretion or mercy rather than to a process of proof. The principle of *Addington,* 441 U.S. at 426, 99 S.Ct. at 1809, as stated in *Jones,* 363 U.S. at 369, 103 S.Ct. at 3052, 77 L.Ed.2d at 708, that "the committed acquittee is entitled to release when he has recovered his sanity or is no longer danger-

ous," could not be applied. If an unrebuttable presumption satisfied due process, a habeas corpus court would have no basis for extending relief to one held by virtue of the presumption, even though the person offered uncontradicted evidence of recovery. Yet Georgia cites the availability of collateral relief as a safety mechanism to insure that insanity acquittees will not be held without a proper basis. We conclude that the *Jones* approval of a presumption of insanity for purposes of commitment may not be extended to make an initial finding that a defendant is insane permanently immune from the processes of proof, including lay and medical evidence.

We need not determine in this class context all the appropriate uses of the presumption. The Georgia legislature and the Georgia courts have substantial freedom to tailor the presumption to fit into a process of reasoned decision making. Without examining the application of the presumption to specific facts and a process of proof at trial, this court cannot decide the appropriate uses of the presumption.

C.  Burden of Proof

█  The class contends that the holding of *Benham II,* on both equal protection and due process grounds, that the state must bear the burden of proof at the insanity acquittee's release hearing should not be disturbed, since *Jones* did not address the issue. *See* 678 F.2d at 539–41. The class also notes that *Williams v. Wallis* does not govern the Georgia placement of the burden of proof on the insanity acquittee in the release hearing that serves as the only avenue for release. *Williams* only approved placing the burden of proof on the insanity acquittee in a habeas corpus proceeding, which was seen as a back-up procedure. Other than distinguishing *Williams v. Wallis,* the class repeats its arguments about the continuing presumption of insanity. We therefore conclude for substantially similar reasons as before that the placement of the burden of proof on the insanity acquittee at the release hearing does not violate either the equal protection

clause or the due process clause. *Accord Dorsey v. Solomon,* 604 F.2d 271, 274 (4th Cir.1979) (proper to place the burden of proving fitness for release on inmates committed in accordance with constitutionally adequate procedures).

### D. Limitation of Release Petitions to One Per Year

■ Under O.C.G.A. § 17–7–131(f)(3), after rendering an adverse release decision in a release hearing, the court may not hear a further release application until twelve months have elapsed. This bar on court action applies whether the petitioner is the insanity acquittee or a hospital official. Thus, during the twelve months between release petitions, the insanity acquittee has no clear avenue, under the Georgia statutory scheme for release. In comparison, M.H.C. committees may be confined against their will for six months initially, and for twelve months on each subsequent commitment order. O.C.G.A. § 37–3–81(d). Although the M.H.C. committee may be released on the approval of the hospital at any time, the M.H.C. committee, like the insanity acquittee, is subject to being held for twelve months without a court hearing.

The parties agree that habeas corpus relief is available to M.H.C. committees, but disagree about its availability to insanity acquittees. At any time, M.H.C. committees may bring habeas corpus petitions challenging the legality of their detention. The burden of proof at the hearing is on the petitioner. *Jones v. Leverett,* 230 Ga. 310, 196 S.E.2d 885 (Ga.1973). The state assumes that habeas corpus relief is also available to the insanity acquittee. It argues that since it is constitutionally permissible to require judicial approval for the release of committed acquittees, the legal burden on an insanity acquittee whose release petition has been denied and an M.H.C. committee whom hospital officials have refused to release is the same. Each is remitted to habeas corpus as the only

avenue for relief from erroneous confinement.

This argument is persuasive. Therefore, our resolution of this issue, which is the most troubling of those presented, requires us to consider the availability under Georgia law of habeas corpus relief to an insanity acquittee who is denied release during the subsequent twelve months before the committing court may hear a petition for release.[8]

An M.H.C. committee may file a petition for habeas corpus to challenge the legality of his involuntary commitment at any time. O.C.G.A. § 37–3–148. The frequency of the habeas corpus remedy is not limited by statute. In contrast, the class argues, the habeas corpus remedy may not be available to an insanity acquittee unless he or she can allege and prove some valid reason for failing to comply with the statutory release procedures. As support for this proposition, the class cites *Crawford v. Linahan,* 243 Ga. 161, 253 S.E.2d 171 (Ga.1979) (habeas relief denied to petitioner who failed to prove valid reason for not appealing criminal conviction). In addition, the Georgia Court of Appeals has indicated that the committing court, rather than the court in the county of detention, has jurisdiction of release proceedings pursuant to O.C.G.A. § 17–7–131. *Moses v. State,* 167 Ga.App. 556, 557, 307 S.E.2d 35 (1983).

The state argues that the *Moses* interpretation does not require a conclusion that the legislature intended by silence to deny insanity acquittees the right to seek a writ of habeas corpus pursuant to O.C.G.A. chs. 9–14. The state cites the Georgia constitutional provision that "the writ of habeas corpus shall not be suspended unless, in case of rebellion or invasion, the public safety may require it." Ga. Const. of 1983, art. I, § 1, ¶ XV.

We accept Georgia's interpretation of the availability of habeas corpus relief to insan-

---

8. The question concerns the availability of Georgia habeas corpus relief. At oral argument, the state suggested that the availability of federal habeas corpus relief was an adequate remedy. This is mistaken. A state may not enact statutes that infringe liberty interests on the theory that federal courts will provide collateral relief.

ity acquittees. In *Benham II*, the court stated that "grave due process questions would be raised if Georgia confined persons for whom there is no basis to believe that they are dangerous." 678 F.2d at 517 n. 11. Refusal to accord habeas corpus relief to confinees who are able to prove at a habeas corpus hearing that they no longer meet the standards for commitment could not be defended under any principles of due process. The state's interest under *Mathews* in efficient processes is served by the one-year limitation. But *Mathews* balancing cannot be a basis for suspending all availability of judicial relief for an erroneous or lawless deprivation of liberty. We need not go into the question whether the Georgia statute may be interpreted to require exhaustion in view of the low likelihood that Georgia would deny all judicial relief to a person involuntarily confined to a mental hospital.

### V. *Conclusion*

We hold that the current Georgia scheme governing the release of insanity acquittees from Georgia mental hospitals is an attempt to balance the interest of the insanity acquittee in liberty against the interest of the state in maintaining a check on the medical profession's assessments of the current mental state of persons acquitted by reason of insanity. We agree with Georgia's interpretation of Georgia law to the effect that habeas corpus law is available to insanity acquittees. Although we approve as constitutional on its face the presumption of continuing insanity, we leave to case-by-case exploration the determination of the proper applications of the presumption.

In striking a due process balance, Georgia has substantially favored the state interests and enhanced the risk of error that a person will be erroneously confined to a mental institution. The soundness of this as public policy is not for us to decide. Under the rationale of *Jones v. United States*, we are unable to say that Georgia has violated either the equal protection clause or the due process clause in the design of its insanity defense statute.

Whether, in application, a particular insanity acquittee's rights are infringed would depend on the facts of the individual case.

The judgment of the district court is affirmed.

AFFIRMED.

### APPENDIX
#### O.G.C.A. § 17–7–131.

(d) Whenever a defendant is found not guilty by reason of insanity at the time of the crime, the court shall retain jurisdiction over the person so acquitted and shall order such person to be detained in a state mental health facility, to be selected by the Department of Human Resources, for a period not to exceed 30 days from the date of the acquittal order, for evaluation of the defendant's present mental condition. Upon completion of the evaluation, the proper officials of the mental health facility shall send a report of the defendant's present mental condition to the trial judge, the prosecuting attorney, and the defendant's attorney, if any.

(e) After the expiration of the 30 days evaluation period in the state mental health facility, if the evaluation report from the Department of Human Resources indicates that the defendant does not meet the commitment criteria of Chapter 3 of Title 37 or Chapter 4 of Title 37, the trial judge may issue an order discharging the defendant from custody without a hearing. If the defendant is not so discharged, the trial judge shall order a hearing to determine whether the defendant should be committed to the Department of Human Resources. The defendant shall be detained in custody until completion of the hearing. The hearing shall be conducted at the earliest opportunity after the expiration of the 30 days evaluation period but in any event within 30 days after receipt by the prosecuting attorney of the evaluation report from the mental health facility. The court may take judicial notice of evidence introduced during the trial of the defendant and may call for testimony from any person with knowledge concerning whether the de-

fendant is currently a mentally ill person in need of involuntary treatment or currently mentally retarded and in need of being ordered to receive services, as those terms are defined by paragraph (12) of Code Section 37-3-1 and Code Section 37-4-40. The prosecuting attorney may cross-examine the witnesses called by the court and the defendant's witnesses and present relevant evidence concerning the issues presented at the hearing. If the judge determines that the defendant meets the commitment criteria of Chapter 3 or 4 of Title 37, the judge shall order the defendant to be committed to the Department of Human Resources to receive involuntary treatment under Chapter 3 of Title 37 or to receive services under Chapter 4 of Title 37. The defendant is entitled to the following rights specified below and shall be notified in writing of these rights at the time of his admission for evaluation under subsection (d) of this Code section. Such rights are:

(1) A notice that a hearing will be held and the time and place thereof;

(2) A notice that the defendant has the right to counsel and that the defendant or his representatives may apply immediately to the court to have counsel appointed if the defendant cannot afford counsel and that the court will appoint counsel for the defendant unless he indicates in writing that he does not desire to be represented by counsel;

(3) The right to confront and cross-examine witnesses and to offer evidence;

(4) The right to subpoena witnesses and to require testimony before the court in person or by deposition from any person upon whose evaluation the decision of the court may rest;

(5) Notice of the right to have established an individualized service plan specifically tailored to the person's treatment needs, as such plans are defined in Chapter 3 of Title 37 and Chapter 4 of Title 37; and

(6) A notice that the defendant has the right to be examined by a physician or a licensed clinical psychologist of his own choice at his own expense and to have that physician or psychologist submit a suggested service plan for the patient which conforms with the requirements of Chapter 3 of Title 37 or Chapter 4 of Title 37, whichever is applicable.

(f) A defendant who has been found not guilty by reason of insanity at the time of the crime and is ordered committed to the Department of Human Resources under subsection (e) of this Code section may only be discharged from that commitment by order of the committing court in accordance with the procedures specified in this subsection:

(1) Application for the release of a defendant who has been committed to the Department of Human Resources under subsection (e) of this Code section upon the ground that he does not meet the civil commitment criteria under Chapter 3 of Title 37 or Chapter 4 of Title 37 may be made to the committing court, either by such defendant or by the superintendent of the state hospital in which the said defendant is detained;

(2) The burden of proof in such release hearing shall be upon the applicant. The defendant shall have the same rights in the release hearing as set forth in subsection (e) of this Code section; and

(3) If the finding of the court is adverse to release in such hearing held pursuant to this subsection on the grounds that such defendant does meet the civil commitment criteria, a further release application shall not be heard by the court until 12 months have elapsed from the date of the hearing upon the last preceding application.