[No. S012984. Aug. 1, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL GORDON TILBURY, Defendant and Appellant.

**COUNSEL**

Charles R. Khoury, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Jean F. Matulis, Joseph A. Ragazzo and Stacy C. Mickell as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant Attorney General, Frederick R. Millar, Jr., Robert M. Foster, Jay M. Bloom and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PANELLI, J.**—The question before us is whether appellant, who has been found not guilty by reason of insanity and committed to a state hospital, is entitled to a jury trial on the issue of his eligibility for placement in a community mental health program as a supervised outpatient. (See Pen. Code, § 1026.2, subd. (e).)[1] The Court of Appeal held that appellant was entitled to a jury trial. We reverse.

### FACTS AND PROCEDURAL BACKGROUND

On April 4, 1984, appellant Michael Gordon Tilbury went on a shooting spree with a .22-caliber rifle. Insane, he believed that he was being persecuted by secret organizations, bombarded with microwaves, and poisoned with drugs in the water supply. During this episode Tilbury shot at and tried to kill several persons, including police officers. Fortunately, he injured only one person.

On January 28, 1985, following treatment to restore his competence to stand trial (§§ 1370, 1372), Tilbury pled guilty to six counts of attempted murder, three counts of assault with a firearm, and three counts of assaulting police officers with a firearm, and admitted one enhancement for inflicting great bodily injury. Pursuant to the plea bargain Tilbury waived his right to a jury trial on the issue of sanity (§ 1026, subd. (a)) and submitted that question to the court. Based upon psychiatric reports, the court found that Tilbury was insane at the time of the offenses and, thus, not guilty by reason of insanity. (*Ibid.*) On March 19, 1985, after additional psychiatric evaluation (§ 1026, subd. (b)), the court determined that Tilbury had not fully recovered his sanity and committed him to Patton State Hospital for a maximum term of 23 years and 8 months. (§ 1026.1, subd. (b).)

In October 1987, following the required minimum commitment period of 180 days (§ 1602, subd. (a)), the director of Patton State Hospital

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

recommended that Tilbury be placed on outpatient status pursuant to section 1603. Because the county mental health director did not advise the court that Tilbury would benefit from that status (§ 1602, subd. (a)(2)), the court disapproved outpatient status as it was required to do. (§ 1601, subd. (a).) The hospital director recommended outpatient placement again in April and October 1987. For the same reasons, the court denied the recommendations. None of these hearings were pursuant to section 1026.2.

In December 1987, Tilbury applied for supervised outpatient placement on his own behalf (§ 1026.2, subd. (a)) and requested a jury trial. Tilbury's counsel argued that he was entitled to a jury under *In re Franklin* (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465], in which we held under a former statute that juries were required at hearings on unconditional release. The trial court denied the request based on *Barnes* v. *Superior Court* (1986) 186 Cal.App.3d 969 [231 Cal.Rptr. 158], in which the Court of Appeal held under the current statute that juries were not required at placement hearings.

At the ensuing placement hearing, for which the court did not empanel a jury, Tilbury testified that he had recently experienced a delusion similar to that which preceded his 1984 shooting spree. Based on Tilbury's testimony and on the reports of psychiatrists, the county mental health department, and the state hospital, the court denied Tilbury's application. On appeal, the Court of Appeal reversed and remanded for a jury trial.

## DISCUSSION

A person who has been found not guilty by reason of insanity and committed to a state hospital must spend one year under supervision as an outpatient in a community mental health program before applying for a trial to declare the restoration of sanity and thereby to obtain unconditional release. (§ 1026.2, subd. (e), operative until Jan. 1, 1994.) We held in *In re Franklin, supra,* 7 Cal.3d 126, 148-149 (*Franklin*), that equal protection principles entitled a committed person to a jury at the sanity-restoration trial. At the time we decided *Franklin,* however, the statute did not require a term of outpatient treatment as a prerequisite to unconditional release. (See former § 1026a, renumbered as § 1026.2 and amended by Stats. 1979, ch. 1114, § 2, p. 4051.) The question now before us is whether the committed person is also entitled to a jury at the first-stage hearing on outpatient placement.

### Statutory Interpretation

We consider the question initially as a matter of statutory interpretation. The relevant statute does not purport to give a committed person the right to

a jury at the hearing on outpatient placement. Instead, the statute provides that "[t]he *court* shall hold a hearing to determine if the person applying for restoration of sanity would no longer be a danger to the health and safety of others, including himself or herself, if under supervision and treatment in the community. If the *court* at the hearing determines the applicant [meets this standard], the *court* shall order the applicant placed with an appropriate local mental health program for one year." (§ 1026.2, subd. (e), italics added.)[2] If the Legislature had intended to require juries at placement hearings, it knew how to say so clearly. In the same statutory scheme the Legislature expressly provided for juries at the sanity phase of criminal trials (§ 1026, subd. (a))[3] and at hearings to recommit at the end of the maximum term (§ 1026.5, subd. (b)(4)).[4]

Even though the Legislature did not expressly provide for jury trials on the issue of outpatient placement, Tilbury advances two arguments to show that it did so implicitly. Neither argument is persuasive.

First, Tilbury argues that the statutory term "hearing" actually means "jury trial." Tilbury bases this argument on *Franklin, supra,* 7 Cal.3d 126, in which we held that a committed person was entitled to a jury at the

---

[2]Section 1026.2, subdivision (e), sets out the standards that a committed person must satisfy to qualify for outpatient treatment, the first stage, and for unconditional release, the second stage. The statute provides, in relevant part:

"The court shall hold a hearing to determine if the person applying for restoration of sanity would no longer be a danger to the health and safety of others, including himself or herself, if under supervision and treatment in the community. If the court at the hearing determines the applicant will not be a danger to the health and safety of others, including himself or herself, while under supervision and treatment in the community, the court shall order the applicant placed with an appropriate local mental health program for one year. All or a substantial portion of the program shall include outpatient supervision and treatment. The court shall retain jurisdiction. The court at the end of the one year, shall have a trial to determine if sanity has been restored, which means the applicant is no longer a danger to the health and safety of others, including himself or herself. The court shall not determine whether the applicant has been restored to sanity until the applicant has completed the one year in the appropriate local mental health program. . . ."

This version of the statute is operative until January 1, 1994. On that date, the prior version of the statute, as amended by Statutes 1984, chapter 1416, section 1, page 4982, will again take effect. (See fn. 5, *post.*)

[3]Section 1026, subdivision (a), provides in part:

"If the *jury* shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time of the offense shall be promptly tried, either before the same *jury* or before a new *jury* in the discretion of the court. . . ." (Italics added.)

[4]Section 1026.5, subdivision (b)(4), provides in part:

"The court shall conduct a hearing on the petition for extended commitment. The trial shall be by *jury* unless waived by both the person and the prosecuting attorney. . . ." (Italics added.)

sanity-restoration hearing described in former section 1026a.[5] The former statute referred to that proceeding simply as a "hearing," without expressly requiring a jury.[6] In 1984, many years after the *Franklin* decision, the Legislature amended the statute to require that a committed person spend one year as a supervised outpatient before applying for a sanity-restoration hearing. (§ 1026.2, subd. (e), added by Stats. 1984, ch. 1416, § 1, p. 4983.) Like the statute we interpreted in *Franklin*, the 1984 amendment once again uses the generic term "hearing," but this time to refer to the newly required proceeding on the committed person's application for outpatient placement. Consequently, to complete Tilbury's argument, we should give a similar interpretation to similar language.

The defect in this argument is that *Franklin* mandated juries at sanity-restoration hearings solely on equal protection grounds, without regard to statutory language or legislative intent. (See *Franklin, supra,* 7 Cal.3d at pp. 148-149.) We did not hold that the term "hearing" meant, or was intended to mean, "jury trial."

Second, Tilbury argues that we can infer a legislative intent to provide juries at placement hearings without regard to the statutory language because the Legislature was aware of *Franklin* at the time it amended the statute to require such hearings. However, the legislators' awareness of *Franklin* logically suggests no more than that they took it for granted juries would continue to be required at sanity-restoration hearings. This was all that *Franklin* held.

Accordingly, there is no good reason to believe that the Legislature actually intended to require jury trials on the issue of outpatient placement. This conclusion is consistent with the purpose of the 1984 amendment, which was to make the requirements for release "stricter" and to "prevent premature release." (See Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1984 (1983-1984 Reg. Sess.) (1984) pp. 1, 2; Assem. Com. on Crim. Law and

[5]Former section 1026a, which has been amended and renumbered as section 1026.2 (Stats. 1979, ch. 1114, § 2, p. 4051; Stats. 1984, § 1, ch. 1416, p. 4982), is presently inoperative but will again take effect on January 1, 1994. The statute is identical in relevant part to the statute in effect at the time of the *Franklin* decision. Subdivision (d) of section 1026.2 provides, in relevant part:

"No hearing upon the application for release shall be allowed until the person committed shall have been confined or placed on outpatient status or on parole under Section 1611 for a period of not less than 90 days from the date of the order of commitment. If the finding of the court is adverse to releasing the person on the ground that sanity has not been restored, no application shall be filed by the person until one year has elapsed from the date of hearing upon the last preceding application. In any hearing authorized by this section, the burden of proving that sanity has been restored shall be upon the applicant. . . ."

[6]See footnote 5, *ante.*

Public Safety, Rep. on Sen. Bill No. 1984 (1983-1984 Reg. Sess.) (1984) p. 3.) In light of these purposes, it is far more reasonable to view the Legislature's imposition of a qualifying period as a reaction to *Franklin* rather than as an effort to require jury trials at an earlier phase of the release process. *Franklin*'s effect, until the 1984 amendment, was to require jury trials every year upon demand, no matter how hopeless the case for unconditional release. After the 1984 amendment, a committed person must first carry the lesser burden of demonstrating that he is no longer a danger to self or others while "under supervision and treatment in the community." (§ 1026.2, subd. (e).)

### Equal Protection

■ Because the relevant statute does not give Tilbury the right to a jury trial, we must address the further question whether constitutional law gives him that right. Tilbury claims that equal protection principles entitle him to a jury because a person committed civilly would be entitled to a jury under similar circumstances.

To address Tilbury's claim, we briefly review the criminal and civil commitment schemes. When a criminal defendant pleads not guilty by reason of insanity, the finder of fact must determine by a preponderance of the evidence whether the defendant was insane at the time of the offense. (§ 1026, subd. (a); see *Franklin, supra,* 7 Cal.3d at pp. 147-148.) It is the defendant who must raise the defense and who bears the burden of proof. (§ 1026, subd. (a); see *People* v. *Baker* (1954) 42 Cal.2d 550, 564 [268 P.2d 705]; *People* v. *Daugherty* (1953) 40 Cal.2d 876, 901 [256 P.2d 911].) If the defendant succeeds in proving his insanity at the time of the offense, commitment follows unless the court determines that the defendant has fully recovered his sanity. (§ 1026, subds. (a), (b).) The maximum term of commitment is equal to the longest term of imprisonment which could have been imposed for the offenses of which the defendant was convicted. (§ 1026.5, subd. (a)(1).) If the state at the end of the maximum term wishes to continue the commitment, it must bear the burden of proving, in a jury trial, that the defendant "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b).) Any ensuing recommitment is for two years only, and additional recommitments require additional jury trials. (§ 1026.5, subd. (b)(6), (8).)

Of course, a defendant who recovers his sanity need not remain confined for the maximum term. Release is possible at any time following a mandatory, 180-day commitment period (§ 1026.2, subd. (d)) if the defendant demonstrates his fitness for release, first by successfully completing one year under supervision in a community mental health program and then in a sanity-restoration trial. (§ 1026.2. subd. (e).)

The procedure for involuntary civil commitments is set out in the Lanterman-Petris-Short Act. (Welf. & Inst. Code, § 5000 et seq.) The process leading to commitment ordinarily begins with a 72-hour period of intensive treatment and evaluation. (*Id.*, §§ 5150, 5170, 5200, 5206.) At the conclusion of the 72-hour period, the professional in charge of the treatment facility and one other physician or psychologist may certify the person for an additional 14 days of intensive treatment. (*Id.*, § 5250 et seq.) Judicial review of the 14-day certification is permitted before a commissioner, referee, or certification review officer. (*Id.*, §§ 5254, 5256.1.) Review is also possible through the writ of habeas corpus. (*Id.*, § 5254.1.) The right to a jury trial attaches only when there is a petition to extend treatment beyond 14 days, or to establish a conservatorship for a gravely disabled person. (*Id.*, §§ 5300-5303.1, 5350, subd. (d).)[7] A commitment for involuntary treatment automatically terminates in 180 days (*id.*, § 5304, subd. (b)) and a conservatorship in one year (*id.*, § 5361). The continuance of a commitment or conservatorship past the end of the designated term requires an additional petition and jury trial, if one is demanded. (*Id.*, §§ 5304, subd. (b), 5361, 5362, subd. (b).)[8]

A civil committee or gravely disabled conservatee does not have the right to a jury trial on the question of his eligibility for release prior to the end of the designated term. However, both may invoke the writ of habeas corpus. (Welf. & Inst. Code, §§ 5254.1, 5358.7, 7250.) A gravely disabled conservatee, in addition, may petition the court for a rehearing as to his status (*id.*, § 5364) but is not entitled to a jury at that hearing. (*Baber* v. *Superior Court* (1980) 113 Cal.App.3d 955, 960-965 [170 Cal.Rptr. 353].)

To summarize, civil and criminal commitments each begin with a jury trial, after any emergency treatment or pretrial detention. In the civil context, the jury trial is the hearing on the petition for involuntary commitment or to establish a conservatorship. In the criminal context, the jury trial is the sanity phase of the criminal trial. In addition, both civil and criminal committees are entitled to juries at the conclusion of the designated term of commitment if there is a petition to recommit. Thus, the difference between the civil and criminal schemes is not the committed person's right to a jury trial but the amount of time before recommitment is required. A civil commitment automatically terminates after 180 days, and a conservatorship after one year. A criminal commitment automatically terminates at the end of the variable maximum term unless, of course, the defendant has already demonstrated his sanity.

---

[7]Similarly, a narcotics addict who has been charged with or convicted of a crime is entitled to a jury trial before commitment to the Department of Corrections for confinement in the narcotics detention, treatment, and rehabilitation facility. (Welf. & Inst. Code, §§ 3050, 3051, 3108.)

[8]A ward of the California Youth Authority is likewise entitled to a jury trial if the state wishes to extend the detention past the end of the designated term. (Welf. & Inst. Code, § 1801.5; see *In re Gary W.* (1971) 5 Cal.3d 296, 305 [96 Cal.Rptr. 1, 486 P.2d 1201].)

In *Jones* v. *United States* (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043] (*Jones*), the United States Supreme Court upheld the District of Columbia's substantially similar criminal commitment procedures. As in California, commitment in the District of Columbia followed the verdict of insanity at the time of the offense and the court's determination that the defendant had not recovered his sanity. Also as in California, the committed person was entitled to a review of his present sanity shortly after commitment, although not by a jury. (*Id.*, at pp. 356-359 [77 L.Ed.2d at pp. 700-702]; cf. §§ 1026, subd. (a), 1026.2, subds. (d), (e).)

The committed person in *Jones* challenged the District of Columbia's procedures as violative of due process and equal protection. He claimed that the verdict of insanity at the time of the offense did not provide a constitutionally sufficient basis for commitment. (463 U.S. at p. 363 [77 L.Ed.2d at pp. 704-705].) Based upon his assumption that the verdict did not provide a sufficient basis for commitment, Jones also claimed that equal protection principles entitled him to a jury at a mandatory hearing 50 days after confinement because civil committees were entitled to a jury trial upon commitment. (*Id.*, at p. 362, fn. 10 [77 L.Ed.2d at p. 704].)

Rejecting Jones's due process challenge, the high court held that the verdict of insanity adequately supported the presumption that insanity continues: "[A] finding of not guilty by reason of insanity is a sufficient foundation for commitment of an insanity acquittee for the purposes of treatment and the protection of society." (*Jones, supra,* 463 U.S. at p. 366 [77 L.Ed.2d at p. 706].) Moreover, the permissible duration of confinement need not be limited by the term of the hypothetical criminal sentence. "[W]hen a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." (*Id.*, at p. 370 [77 L.Ed.2d at p. 709].)

The high court's rejection of Jones's due process challenge logically compelled the rejection of his equal protection challenge, as well. Jones argued that equal protection entitled him to a jury at the mandatory hearing 50 days after commitment because a civil committee would have been entitled to a jury at the time of commitment. However, since the criminal commitment was based on the verdict of insanity in the criminal trial, and since that procedure satisfied due process, it followed that "the relevant equal protection comparison concern[ed] the procedures available at the criminal trial and at a civil-commitment hearing." (*Jones, supra,* 463 U.S. at p. 362, fn. 10 [77 L.Ed.2d at p. 704].) Because Jones had received a jury trial at the sanity phase of the criminal trial, equal protection was satisfied. (*Ibid.* [77 L.Ed.2d at p. 704].)

Our reasoning in *Franklin* is partly consistent with *Jones* and partly inconsistent. One of the questions before us in *Franklin* was whether the required waiting period between the verdict of insanity in the criminal trial and the first release hearing was constitutional.[9] As the high court would later recognize in *Jones*, we recognized that the verdict of insanity at the criminal trial supported "a presumption of continued insanity." (*Franklin, supra*, 7 Cal.3d at p. 141, fn. 9.) We reasoned that " 'commitment without a hearing [on present sanity] is permissible for the period required to determine present mental condition. The jury's finding of a reasonable doubt as to defendant's sanity at the time of the offense provides sufficient warrant for further examination.' " (*Franklin, supra*, 7 Cal.3d at p. 142, quoting *Ragsdale* v. *Overholser* (D.C. Cir. 1960) 281 F.2d 943, 948, italics omitted.) In other words, because "the defendant [has] had the burden of proving his insanity by a preponderance of the evidence," "it is reasonable to presume . . . that defendant's insanity, established by a preponderance of the evidence, has continued to the date of trial [on present sanity, i.e., the release hearing]." (*Franklin, supra*, 7 Cal.3d at p. 141, fn. deleted.)

This much of the *Franklin* opinion is entirely consistent with *Jones*. So also, we assume, is our explicit assumption in *Franklin* that "California's initial commitment procedures are valid only because the person committed has a reasonable opportunity to obtain his release." (*Franklin, supra*, 7 Cal.3d at p. 145.) Because an insanity acquittee is entitled to a hearing on outpatient placement 180 days after commitment, here, as in *Jones*, "there is assurance that every acquittee has prompt opportunity to obtain release if he has recovered." (*Jones, supra*, 463 U.S. at p. 366 [77 L.Ed.2d at p. 706].)[10]

*Franklin* differs from *Jones*, however, in holding that postjudgment hearings on present mental sanity must be conducted before juries. In *Franklin* we "found no sufficient reason why [an insanity acquittee's] status necessarily must deny him the jury hearing available to other persons committed to state hospitals." (*Franklin, supra*, 7 Cal.3d at p. 148; see *Jones, supra*, 463 U.S. at pp. 364-366 [77 L.Ed.2d at pp. 705-706].) We then proceeded to

---

[9]The waiting period was 90 days when we decided *Franklin*. In 1984 the Legislature increased it to 180 days, as the American Law Institute recommended in its Model Penal Code. (Stats. 1984, ch. 1488, § 3.5, p. 5202; see Model Pen. Code, § 4.08(5); Assem. Com. on Crim. Law and Public Safety, Rep. on Sen. Bill No. 1984 (1983-1984 Reg. Sess.) (1984) p. 5 [noting the recommendation in the Model Penal Code]; Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1984 (1983-1984 Reg. Sess.) (1984) p. 6 [same].)

[10]As an additional safeguard, the court must also order an evaluation of the insanity acquittee by the community program director or a designee immediately following the verdict of not guilty by reason of insanity and "prior to making [an] order directing that the [acquittee] be confined . . . ." (§ 1026, subd. (b).) The Legislature added this provision after our decision in *Franklin, supra*. (See Stats. 1975, ch. 1274, § 1, p. 3390.)

compare California's criminal *release* statute with various civil *commitment* and *recommitment* statutes. (*Franklin, supra,* 7 Cal.3d at p. 148, citing Welf. & Inst. Code, §§ 1800-1803 [California Youth Authority wards], 5302 [persons committed for involuntary treatment], 5350 [gravely disabled conservatees]; see *ante,* pp. 63-64.) Because persons committed civilly were entitled to juries at commitment and recommitment hearings under those statutes, we held that equal protection also required juries at criminal release hearings. (*Franklin, supra,* 7 Cal.3d at p. 148.)

Some history is necessary to put the 18-year-old *Franklin* holding into context. The statutes in effect in 1973 did not provide for a hearing before a jury at any time after the determination of insanity at the criminal trial. (See former §§ 1026, 1026a; Stats. 1935, ch. 318, §§ 1, 2, pp. 1075-1076, as amended by Stats. 1957, ch. 1766, § 1, p. 3160.) In 1979, responding to criticism by this court, the Legislature amended the law to require that an insanity acquittee be either released or recommitted at the end of a designated, maximum term. The maximum term is equal to the longest term of imprisonment which could have been imposed for the offenses that the person committed. (§ 1026.5, added by Stats. 1979, ch. 1114, § 3, pp. 4051-4053; see *In re Moye* (1978) 22 Cal.3d 457 [149 Cal.Rptr. 491, 584 P.2d 1097] [requiring recommitment of insanity acquittees under civil commitment procedures at the end of the maximum term provided for the underlying offense].) If the state wishes to recommit at the expiration of the maximum term, it must prove in a jury trial that the defendant, by reason of a mental disease, defect, or disorder, continues to represent a substantial danger of physical harm to others. (§ 1026.5, subd. (b).) Thus, the current statute shifts to the state at the end of the maximum term the burden of proving that confinement continues to be necessary.

These changes in the law since *Franklin,* as well as the high court's decision in *Jones,* make it unnecessary to require a jury in every postjudgment hearing on present mental sanity when the defendant has pled and proved his own insanity at the criminal trial before a jury, if one was demanded. Even though success at the placement hearing is a prerequisite to eventual release, equal protection does not give a criminal committee the right to a jury at such hearings because civil committees likewise do not have the right to juries at release hearings, which in the civil context take the form of habeas corpus proceedings or court hearings to reconsider a gravely disabled conservatee's status. (See *ante,* pp. 63-65.) In *Franklin,* as already mentioned, we made a different comparison: we compared criminal *release* procedures with civil commitment and recommitment procedures. (See *Franklin, supra,* 7 Cal.3d at p. 148, and the statutes cited therein.) However, the correct comparison is articulated in *Jones*: When a defendant's commitment is based on the judgment of insanity at the criminal trial, "the relevant

equal protection comparison concerns the procedures available at *the criminal trial* and at a civil-commitment hearing." (*Jones, supra*, 463 U.S. at p. 362, fn. 10 [77 L.Ed.2d at p. 704], italics added.)

Because criminal and civil committees enjoy the right to jury trials at the same stages of the commitment process, equal protection is not offended. Although the law treats insanity acquittees differently with respect to the amount of time before recommitment is required, differences in criminal and civil commitment procedures need only be justified by a rational basis. (See *Jones, supra*, 463 U.S. at p. 362, fn. 10 [77 L.Ed.2d at p. 704]; *Buthy* v. *NY Com'r of Office of Mental Health* (2d Cir. 1987) 818 F.2d 1046, 1049; *Benham* v. *Ledbetter* (11th Cir. 1986) 785 F.2d 1480, 1485.) Such differences reflect "the widely and reasonably held view that insanity acquittees constitute a special class that should be treated differently from other candidates for commitment." (*Jones, supra*, 463 U.S. at p. 370 [77 L.Ed.2d at p. 709].) The rational basis for California's different treatment of insanity acquittees is that such a person initiates the commitment process himself by pleading and proving that mental illness has led him to commit a crime. These circumstances substantially reduce the risk of erroneous commitment, or commitment for harmless, abnormal behavior, that justifies the need for frequent recommitment hearings in the civil context.

There is no need in this case to reconsider *Franklin*'s holding that a criminally committed person is entitled to a jury at the sanity-restoration trial. Since the Legislature was aware of that holding at the time it amended the statute and made no effort to abrogate it, we assume that juries at sanity-restoration hearings have become part of California's current statutory scheme. In view of *Jones*, however, there is no reason to extend *Franklin*'s holding to the first-stage hearing on outpatient placement.

### *Due Process*

■    Nor does due process entitle Tilbury to a jury at the outpatient-placement hearing. There is, of course, no doubt that criminal commitment procedures must satisfy due process. "'[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" (*Jones, supra*, 463 U.S. at p. 361 [77 L.Ed.2d at p. 703], quoting *Addington* v. *Texas* (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 330-331, 99 S.Ct. 1804].) However, due process does not call for the same procedures in every situation. Instead, "'[d]ue process is flexible and calls for such procedural protections as the particular situation demands.'" (*Jones, supra*, 463 U.S. at p. 367 [77 L.Ed.2d at p. 707], quoting *Morrissey* v. *Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593].)

■ In determining whether a particular set of procedural safeguards is adequate, it has become traditional to weigh several factors: "[F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews* v. *Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 33, 96 S.Ct. 893]; see also *Zinermon* v. *Burch* (1990) 494 U.S. 113 [108 L.Ed.2d 100, 115 110 S.Ct. 975].)

■ Consideration of these three factors does not lead to the conclusion that due process requires the state to provide juries at placement hearings. First, the involvement of a liberty interest does not by itself implicate the right to a jury. Juries have not been found necessary in other proceedings that can result in deprivations of liberty. (E.g., *Morrissey* v. *Brewer, supra,* 408 U.S. 471, 488-489 [33 L.Ed.2d 484, 498-499] [stating the minimum requirements of due process in parole revocation hearings]; *McKeiver* v. *Pennsylvania* (1971) 403 U.S. 528, 541-551 [29 L.Ed.2d 647, 658-664, 91 S.Ct. 1976] [the due process clause of the Fourteenth Amendment, incorporating the Sixth Amendment, does not require juries in juvenile court proceedings]; *Baldwin* v. *New York* (1970) 399 U.S. 66, 68-74 [26 L.Ed.2d 437, 439-443, 90 S.Ct. 1886] [the same is true in trials of petty offenses].) Instead, the importance of the insanity acquittee's liberty interest is reflected by such a person's right to the substantial procedural safeguards associated with trials, including, among other things, the right to counsel, to a detached and neutral judicial officer, to present evidence, and to cross-examine adverse witnesses. (See § 1026.2, subd. (e) [the hearing on unconditional release is a "trial" before the superior court].)

Second, there is no reason to believe that a jury's decision on outpatient placement would be more reliable than a judge's. The decision to be made is whether "the applicant will not be a danger to the health and safety of others, including himself or herself, while under supervision and treatment in the community." (§ 1026.2, subd. (e).) Juries have no more expertise in predicting future dangerousness than judges. Moreover, in the event of an erroneous decision the committed person has recourse to the writ of habeas corpus and to direct appeal (see Code Civ. Proc., § 904.1, subd. (b)), which are the same mechanisms that ensure the reliability of jury verdicts.

Third, the state has an obvious and valid interest in avoiding the cost of unnecessary jury trials. On this point, it is well to bear in mind that *Franklin*'s effect was to require the state to provide jury trials every year upon demand, even for a committed person who could not reasonably hope

to prove that he would no longer be a danger to self or others. The current statute mitigates this unnecessary burden by requiring a committed person first to demonstrate that he would not be dangerous to self or others "while under supervision and treatment in the community." (§ 1026.2, subd. (e).) A person who cannot satisfy this lower standard cannot, by definition, satisfy the higher standard for unconditional release. (See *Barnes* v. *Superior Court*, *supra*, 186 Cal.App.3d at p. 976.)

In summary, the relevant factors do not, singly or in combination, support the conclusion that it violates due process for a judge to consider an insanity acquittee's application for placement in a community mental health program. Insanity acquittees already enjoy substantial procedural safeguards at placement hearings, and the addition of juries would make such hearings more costly and burdensome without making their outcomes more reliable. Under these circumstances, due process does not require more than the statute already provides.[11]

The Legislature's effort to deal with the problem of criminal commitments is entitled to as much judicial deference as constitutional principles permit. ■ As the United States Supreme Court has recognized, " '[w]hen [a legislative body] undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation . . . .' " (*Jones, supra,* 463 U.S. at p. 370 [77 L.Ed.2d at p. 709], quoting *Marshall* v. *United States* (1974) 414 U.S. 417, 427 [38 L.Ed.2d 618, 626, 94 S.Ct. 700].) To require jury trials at placement hearings without the clearest constitutional necessity would send the message that we, not the Legislature, make the rules in this area, and thus stifle further legislative efforts to fashion appropriate solutions.

---

[11]The Court of Appeal in this case expressed its concern that commitments to mental institutions "are, as we have seen frequently in the history of many countries, and occasionally our own, subject to misguided or malicious manipulation." (Cf. *Barnes* v. *Superior Court*, *supra*, 186 Cal.App.3d at p. 977 (dis. opn. of Poché, J.) [comparing California's criminal commitment procedures with the "Gulag"].

We believe that this concern is vastly overstated, for several reasons. First, it is the defendant—not the government—who initiates the criminal commitment by pleading and proving insanity. Second, we have no reason to believe that superior court judges will engage in "malicious manipulation" to extend commitments. In the unlikely event that such a thing should occur, defendants have recourse to direct appeal and to the writ of habeas corpus—the same procedural mechanisms that ensure the reliability of jury verdicts. Third, a criminal committee is automatically entitled to a jury trial at the expiration of the maximum term. (§ 1026.5, subd. (b)(3).) Tilbury's maximum term is long only because he committed a large number of serious crimes, including six attempted murders. By comparison, if he had committed a robbery he would have been entitled to a jury trial in five years. If he had committed a simple assault, his commitment would have ended in six months; the Penal Code does not authorize extension of the criminal commitment of an insanity acquittee whose crime was a misdemeanor. (§ 1026.5, subds. (a)(3), (b)(1).)

DISPOSITION

The decision of the Court of Appeal is reversed.

Lucas, C. J., Broussard, J., Arabian, J., and Baxter, J., concurred.

**MOSK, J.**—I dissent. The Court of Appeal held that a person found not guilty by reason of insanity is constitutionally entitled to a jury determination of his or her mental state after a statutorily prescribed 180-day evaluation and treatment period. The Court of Appeal reached the correct result, and therefore I would affirm its judgment.

A former patient of mental hospitals in Long Beach and Brawley, and a self-described paranoiac suffering from delusions of persecution, Tilbury ran amok with a rifle in April 1984, shooting at several citizens and peace officers. He was charged with 12 felonies, including multiple counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(2)),[1] assault with a firearm on a peace officer (§ 245, subd. (c)), and attempted murder (§§ 187, 664). He entered guilty pleas to six counts of attempted murder, and admitted enhancements for use of a firearm and for the infliction of great bodily injury with respect to one of the counts. (§§ 12022.5, 12022.7.) It was agreed that his maximum term of imprisonment would be 23 years, 8 months, and that after accepting the guilty pleas the court could determine Tilbury's sanity during the shooting spree on the basis of psychiatrists' reports. The court found him insane during his crimes and committed him to Patton State Hospital.

Three times in 1986 and 1987 the director of Patton State Hospital recommended that Tilbury be released to outpatient treatment, on the ground that he was no longer a danger to himself or others. (§ 1603, subd. (a)(1).) Each time the director of the Orange County community mental health program disagreed with the recommendation of release, and the court therefore denied the request, as it must when the community program director maintains that release is not justified. (*Id.*, subd. (a)(2).)

Tilbury then sought release to a supervised outpatient treatment program under an alternative release procedure, embodied in section 1026.2, on the ground that he would pose no danger to himself or others under supervision in the community. (§ 1026.2, subd. (e).) He requested a jury trial on the current state of his mental health. The trial court ruled, however, that defendant was not entitled to a jury trial, and heard the matter itself.

---

[1]Further unlabeled references are to this code.

At the hearing, Tilbury testified that he participated in 30 hours of group therapy per week at Patton State Hospital. He emphasized his participation in the thought-disorder, anger-management and relapse-prevention groups, and in Narcotics Anonymous. On cross-examination, Tilbury admitted he had a delusion seven months before, lasting several days, that there was cocaine in the water at Patton State Hospital. Though Tilbury had a similar delusion the day of his rifle-wielding outburst, the court denied outpatient status on another factual ground, finding Tilbury to be, "because of his anger management problems, [still] a danger to himself and others, particularly to others."

The Court of Appeal reversed. It held that *In re Franklin* (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465] (hereafter *Franklin*), required a jury to pass judgment on Tilbury's sanity at the end of an initial treatment and evaluation period that, by statute, follows a judgment of not guilty by reason of insanity. Although the current statutory scheme has changed so that instead of winning immediate release a patient found sufficiently sane to return to society must now spend one year in a supervised outpatient program, the Court of Appeal reasoned that the outpatient-treatment decision is a critical procedural juncture, requiring access to a jury. Otherwise, the Court of Appeal observed, Tilbury could be caught in a classic Catch-22: although under *Franklin* Tilbury would have the right to a jury review of his fitness for unrestricted release, it is possible that during his almost 24-year term of confinement no jury would have the chance to undertake this review, because a judge might deny access to the prerequisite supervised outpatient program.

I

A person found not guilty by reason of insanity has more than one avenue to change status. If a patient who committed an act that posed a serious threat of bodily harm to another can persuade both the community program director (an individual defined in § 1026, subd. (h); see § 1605, subd. (a)) and the director of the state hospital where he or she is confined that release to outpatient status is warranted, such status may be granted under section 1600 et seq. (See §§ 1601, subd. (a), 1603.) In the alternative, the individual may seek relief under section 1026.2. For a patient in Tilbury's position, the requirements of section 1026.2 are easier to satisfy, for the concurrence of the community program director is not needed if the director of the state hospital where the patient is confined recommends release to outpatient treatment. (§ 1026.2, subd. (a).)

Before 1986, the predecessors of section 1026.2 mandated a minimum 90-day commitment for a person found not guilty by reason of insanity. (See

former §§ 1026, 1026a.) After that period, the patient could be released outright if the trier of fact was persuaded that the patient's sanity had been restored. The former scheme did not define "sanity."

A more complex procedure is now in force, embodied in section 1026.2.[2] Subdivision (e) thereof provides that once the hospital director has said the patient should be released, "[t]he court" must hold a "hearing" to determine whether "the person applying for restoration of sanity would no longer be a danger to the health and safety of [self or] others . . . if under supervision and treatment in the community." If "the court" decides the patient is a danger neither to self nor others, the patient must be placed in "an appropriate local mental health program for one year." (*Ibid.*) Otherwise the patient must wait one year before again applying for release to outpatient treatment. (§ 1026.2, subd. (j).) After the year has elapsed, "[t]he court . . . shall have a trial to determine if sanity has been restored, which means the applicant is no longer a danger to the health and safety of [self or] others . . . ." (§ 1026.2, subd. (e).) The patient has the burden of showing fitness for release, either to an outpatient program or for outright release after a year in the program, by a preponderance of the evidence. (§ 1026.2, subd. (k).)

The majority conclude that the relevant statutory language evinces no legislative intent to require access to a jury. Under the rules of statutory construction, however, the Legislature is deemed to have preserved the right to a jury trial at the end of the 180-day postcommitment evaluation and treatment regimen that takes place within the confines of a state hospital. (See §§ 1026, subd. (a), 1026.2, subd. (d).)

Under the pre-1986 scheme, and hence under the virtually identical scheme now slated to resume in 1994, the patient was entitled to a jury trial at the end of the initial evaluation period under confinement in the state hospital. This right found its genesis in *Franklin, supra,* 7 Cal.3d 126. *Franklin* considered whether a person found not guilty by reason of insanity was entitled to a jury trial on the question of fitness for release to society under former section 1026a. Former section 1026a provided that after an initial 90-day evaluation and treatment period in a state hospital, if "the court," in a "hearing," found the patient's sanity had been restored, the patient must be released outright.

Writing for a unanimous court, Justice Burke concluded that equal protection required the " 'essential safeguard' " (7 Cal.3d at p. 148) of a jury trial

---

[2] The pre-1986 scheme is scheduled to again take effect on January 1, 1994. (See § 1026.2, subd. (m).)

on request when the patient sought release after the initial 90-day evaluation and treatment period: "Although petitioner's status as a member of a special or exceptional class justifies certain differences in commitment procedure, including mandatory or discretionary prehearing commitment . . . and imposition . . . of the burden of proving . . . fitness for release, we find no sufficient reason why his status necessarily must deny him the jury hearing available to other persons committed to state hospitals." (*Ibid.*)

Thus, when the Legislature chose to enact the current statutory scheme, existing law required a jury trial.[3] Current section 1026.2 expresses no intent to abrogate *Franklin.* Its drafters added only two significant requirements, neither bearing on access to a jury: that the first year after release be spent in a supervised outpatient program in the community, after which the patient's dangerousness to self or others would again be reviewed; and that the patient spend one hundred eighty days in the hospital before seeking release. We must therefore presume that the Legislature intended to preserve *Franklin's* rule. (*Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394]; *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 618 [7 Cal. Rptr 129, 354 P.2d 657].)

A case that reached the same result as the majority, *Barnes* v. *Superior Court* (1986) 186 Cal.App.3d 969 [231 Cal.Rptr. 158] (hereafter *Barnes*), approached the statutory construction issue somewhat differently. It found significant the Legislature's use of "hearing" and "trial" to describe the procedures whereby a patient may seek release. Yet *Barnes* reviewed the legislative history behind the enactment of subdivision (e) only briefly, and did not consider the language of section 1026.2 as a whole in determining that the Legislature meant something different by "hearing" and "trial."

After examining the history and wording of the statute I agree with another Court of Appeal that in fact "[s]ection 1026.2 uses 'hearing' and 'trial' interchangeably. (See, e.g., § 1026.2, subds. (b), (d), (f), (i), (k).) No distinction is made based on the presence or absence of a jury, and we are unable to divine the source for such a differentiation." (*People* v. *Superior Court* (*Almond*) (1990) 219 Cal.App.3d 607, 612 [268 Cal.Rptr. 375] (hereafter *Almond*) [holding that the People have a right to a jury trial when the patient, already on outpatient status, seeks to have supervision ended and to gain outright release].)[4]

---

[3]The majority criticize *Franklin* for comparing criminal release statutes to civil commitment and recommitment statutes. (Maj. opn., *ante*, pp. 66, 68; see, *post*, pp. 77-78.) For statutory construction purposes, however, the point is irrelevant.

[4]For this reason and others outlined herein, the Legislature may wish to reexamine the statutory scheme before its scheduled 1994 expiration date.

The statutory language buttresses the conclusion of *Almond.* One striking example, section 1026.5, subdivision (b)(4), provides in part: "The court shall conduct a *hearing* on the petition for extended commitment. The trial shall be by jury unless waived by both the person and the prosecuting attorney." (Italics added.)[5] Section 1026.2 is no less self-contradictory, though less obviously so. Subdivision (e) thereof defines both the "hearing" and the "trial" as "court" proceedings in which the patient's danger to self or others will be evaluated. No discernible difference exists between the nature of the proceedings, except that the "hearing" is to occur first and the "trial" a year later. Subdivision (k) provides that in "any hearing" under section 1026.2 the patient bears the burden of proof by a preponderance of the evidence; but because the section contemplates two separate proceedings to evaluate mental state in subdivision (e), the burden rule of subdivision (k) clearly is intended to apply to both the "hearing" and the "trial" described in subdivision (e). Finally, subdivision (a) of section 1026.2 provides that whether the patient is confined to the hospital and thus seeking a first-stage release "hearing" (subd. (e)), or is already in outpatient treatment under section 1601 and hence is seeking a second-stage release "trial" (subd. (e)), the court shall give notice of the "hearing" date to decide the patient's status. Thus the statute reinforces *Almond*'s conclusion that if the Legislature intended to differentiate a "hearing" from a "trial," the source and nature of any such distinction are unfathomable.

Nor does the legislative history suggest any intent to assign a distinct meaning to each term; rather, the committee reports confirm the lack of any such intent. The report of the Assembly Committee on Criminal Law and Public Safety announced that the minimum confinement period will rise to 180 days, from 90, before a patient may apply for "a sanity restoration hearing." (Assem. Com. Rep., Com. on Crim. Law and Public Safety, p. 2, on Sen. Bill No. 1984 (1983-1984 Reg. Sess.).) After a year in an outpatient program, the patient may seek "a sanity restoration trial." (*Id.* at pp. 5-6.) At first, this language suggests that the Assembly committee meant to differentiate the two proceedings. But that suggestion is immediately refuted by other language in the committee's analysis, which recites that after the year of outpatient treatment the patient will be entitled to "a sanity restoration hearing." (*Id.* at p. 5.) Thus, the Assembly committee analysis used "hearing" and "trial" interchangeably and no particular significance can be attached to the desultory use of one word in lieu of another.

The Senate committee analysis similarly reveals a lack of intent to distinguish between "trial" and "hearing": it simply refers to both proceedings as

---

[5]The majority invoke the same language but reach a different conclusion regarding its significance. (See maj. opn., *ante,* p. 61, fn. 4.)

a "hearing." (Sen. Com. Rep., Com. on Judiciary, p. 5, on Sen. Bill No. 1984 (1983-1984 Reg. Sess.).)

Nor do I perceive any special significance to be attached to the word "hearing" as a matter of law. While the word often conjures an image of an administrative or judicial proceeding before a referee or a judge, we have previously defined a hearing as any "proceeding where evidence is taken to the end of determining an issue of fact and a decision made on the basis of that evidence." (*People* v. *Pennington* (1967) 66 Cal.2d 508, 521 [58 Cal.Rptr. 374, 426 P.2d 942].) Thus, "hearing" subsumes "trial."

*Franklin* uses the terms "jury hearing" and "jury trial" interchangeably to describe the constitutionally mandated procedural requirements that attach to proceedings to determine whether a civilly committed person is fit for release. (7 Cal.3d at p. 148.) And *Franklin* does not lack company; indeed, both the Legislature and the courts have implicitly acknowledged the lack of any necessary difference between "trial" and "hearing." (See, e.g., § 1538.5, subd. (d) [illegally seized evidence "shall not be admissible against the movant at any trial or other hearing"]; §§ 1026.2, subd. (k), and 1026.5, subd. (b)(4), discussed *ante*; see also Cal. Law Revision Com. com., Deering's Ann. Evid. Code (1986 ed.) § 145, p. 20 [suggesting "hearing" encompasses trial and other proceedings]; *People* v. *Ivenditti* (1969) 276 Cal.App.2d 178, 180, fn. 2 [80 Cal.Rptr. 761] [at second proceeding on People's petition to commit defendant as a drug addict, statute forbade defendant to waive his right to "a second hearing with a jury, only"]; People v. *Gallegos* (1970) 4 Cal.App.3d 93, 95-96 [83 Cal.Rptr. 911] ["the nature of the hearing (by jury or by judge alone) is not of jurisdictional dimension"].)

The Legislature has stated that in 1994 the law will revert to that under which *Franklin* was decided.[6] Had the Legislature desired that only a judge then hear petitions for conditional release, it would have taken note of our explicit observation in *Franklin* that "[i]t is noteworthy that section 1026a does not, by its terms, preclude a jury trial" (7 Cal.3d at p. 149), and would have specified that only a judge would hear the case. While *Franklin*'s constitutional reasoning might have made any such attempt futile, legislative direction in the version to take effect in 1994 would at least have undercut *Franklin*'s statutory conclusions. The Legislature's failure to modify a scheme under which we found a right to jury trial confirms that it had no intent to have a judge necessarily decide Tilbury's mental state.

---

[6]See future section 1026.2, to take effect January 1, 1994. As is true of the current statute, future section 1026.2 contains ambiguities and inconsistencies: subdivision (d), for instance, refers to "parole" under section 1611, a statute that was abolished. (Stats. 1984, ch. 1488, § 11, p. 5210.)

## II

Constitutional considerations also compel a conclusion that Tilbury was entitled to a jury trial after the initial evaluation and treatment period.

First, the scheme offends equal protection principles. There is no rational basis for granting the right of a jury trial to some civilly committed persons on the issue of eligibility for release (Welf. & Inst. Code, §§ 5302, 5303, 5304, subd. (b)) while denying the same to criminally committed persons, who may be no more dangerous than others who are entitled to a jury (see Morse, *Excusing the Crazy: The Insanity Defense Reconsidered* (1985) 58 So.Cal.L.Rev. 779, 832).[7] There is, therefore, no rational basis on which to distinguish Tilbury from members of another class entitled to a jury trial. (*In re Gary W.* (1971) 5 Cal.3d 296, 304 [96 Cal.Rptr. 1, 486 P.2d 1201]; see also *United States* v. *Brown* (D.C. Cir. 1973) 478 F.2d 606, 611 [dictum; "no justification" for denying insanity acquittees trial by jury prior to commitment when prospective civilly committed persons enjoy that right].)[8]

The majority declare that in *Franklin* we wrongly compared criminal release statutes to various civil commitment and recommitment statutes. To the extent that *Franklin* compared commitment and release statutes, the juxtaposition may be questioned. But *Franklin* did not err in contrasting civil *recommitment* statutes with criminal release statutes for equal protection purposes. I cannot fathom the distinction the majority would draw between the two: if a patient is not recommitted under a civil statute, the result is release; if the patient is released under the Penal Code, the result is also release.

---

[7]It seems obvious that a judge is no more able to predict violent tendencies in the long run than a juror. Indeed, mental health professionals' ability to predict future dangerousness is at best questionable. (See *id.* at p. 828; *Barefoot* v. *Estelle* (1983) 463 U.S. 880, 920-922 [77 L.Ed.2d 1090, 1121-1123, 103 S.Ct. 3383] [dis. opn. of Blackmun, J.]; *People* v. *Burnick* (1975) 14 Cal.3d 306, 325-326 [121 Cal.Rptr. 488, 535 P.2d 352] ["Psychiatrists themselves would be the first to admit that however desirable an infallible crystal ball might be, it is not among the tools of their profession."]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 768-769 [175 Cal.Rptr. 738, 631 P.2d 446].)

[8]In support of its view that it did not deny Barnes equal protection to refuse him access to a jury, *Barnes, supra,* 186 Cal.App.3d 969, also observed that Welfare and Institutions Code section 3151 permits an administrative board to decide whether to end the commitment of a narcotics addict not convicted of any crime in favor of outpatient status. I do not at this time undertake an extended exploration of the narcotics addict commitment statutes, but note that the members of the board to which *Barnes* referred should "have a broad background in law, sociology, law enforcement, medicine, or education, and shall have a deep interest in the rehabilitation of narcotic addicts." (Welf. & Inst. Code, § 3150, subd. (a).) Whether a similar board to decide insanity acquittees' release eligibility should be created is, of course, a legislative prerogative. The Oregon Revised Statutes (ORS) provide for a board of like composition that decides whether individuals with Tilbury's status may be conditionally or absolutely released. (ORS § 161.325-161.351, 161.385(2); see *Adams* v. *Psychiatric Sec. Review Bd.* (1980) 290 Ore. 273 [621 P.2d 572].)

The majority's conclusion, following this analysis, that the relevant equal protection comparison concerns the procedures available at the criminal trial and at a civil commitment hearing, arguably states the view of the United States Supreme Court on that issue. The question here, however, is whether equal protection is offended when a patient committed for an act that would be proscribed under the Penal Code must wait decades for a jury determination of the need for recommitment, while some civilly committed persons are entitled to a jury resolution of the same question in a matter of months (Welf. & Inst. Code, §§ 5302, 5303, 5304, subd. (b)). To ask the question is to answer it, unless it can be demonstrated that patients committed from criminal courts are less susceptible of restoration to sanity than those civilly committed.

With regard to due process, it is true that juries have not been found necessary in other proceedings that can result in deprivations of liberty. I therefore agree with much of the majority's analysis of the general principles underlying that constitutional right. (Maj. opn., *ante*, p. 69.) Nevertheless, I conclude that the scheme before us does violate due process for other reasons.

First, it is arbitrary to provide access to community review of the patient's fitness for release as an afterthought but to deny it at the crucial procedural stage. *Barnes* relied on its view that the first-stage proceeding is a lower hurdle than the second to reject a due process claim (186 Cal.App.3d at pp. 975-976), and the majority agree. But as amicus curiae observes, that notion is misconceived. In the first phase, a patient's fitness to leave a life under lock and key and resume life in the community is at issue. This is a far more critical determination than that made in the second phase, when the only question is whether the patient has spent a successful year in the community and hence no longer requires supervision. The first step is the major hurdle, for it confers on the patient conditional but real reintegration into the community. To draw on the language of contract or property law, this status will be revoked only on failure of a condition subsequent—peaceful coexistence with society for one year. Entry into the supervised program is the critical juncture, the moment at which the full company of the community's and the patient's interests must take center stage; all that remains to be decided at the second phase is whether the previous judgment of the trier of fact was sound.

Second, the scheme before us violates due process because it arbitrarily conditions the length of time a patient must await a jury hearing not on current dangerousness, but on the nature of the act committed. Tilbury may have recovered his sanity just as quickly as a neighboring patient confined after being charged with a much less serious felony. Yet the neighbor has

access to a jury in a year or two, while Tilbury must possibly wait decades. (See generally § 1026.5.) A patient who committed misdeeds that could otherwise have resulted in life imprisonment without possibility of parole could remain confined for life without access to jury review, though he or she might have recovered sanity as quickly as a patient originally charged with a far lesser offense. While this disparity also merits scrutiny on equal protection grounds, I believe at a minimum that it is arbitrary and hence violates due process. For example, a minimally disturbed patient originally charged with a tax offense may have to wait three years (see Rev. & Tax. Code, § 19405) before a jury review of his or her mental state, after which he or she can remain confined, while a much more dangerous patient charged with simple assault could be free after six months (see § 241, subd. (a)). (See § 1026.5, subds. (a)(1), (3), & (b)(1), (3).)

The Supreme Court of Canada very recently held that that country's insanity-acquittee scheme offends a constitutional guarantee against arbitrary detention and imprisonment because it provided that "Where the accused is found to have been insane at the time the offence was committed, the court . . . shall order that he be kept in strict custody . . . until the pleasure of the lieutenant governor of the province is known."[9] (*R. v. Swain* (Can. 1991) 1 S.C.R. 933, 958 [63 Can Crim. Cas. 3d 481, 495], quoting former Can. Crim. Code, R.S.C. (1970) ch. C-34, § 542(2).) The justice commanding a majority concluded, "The detention order is automatic, without any rational standard for determining which individual insanity acquittees should be detained and which should be released. . . . The duty of the trial judge to detain is unqualified by any standards whatsoever. I cannot imagine a detention being ordered on a more arbitrary basis." (*Id.* at p. 1012 [63 Can. Crim. Cas. 3d at p. 535].) "There is no time requirement within which the Lieutenant Governor must act . . . . In fact, the wording of the legislation does not require the Lieutenant Governor to ever make an order." (*Id.* at p. 1016 [63 Can. Crim. Cas. 3d at p. 538.].)

Our statutory scheme does not offend due process in quite the same manner. But if the offensive elements in our scheme are different, they are no less Kafkaesque. Inability to reach a jury because a judge declines to advance the case, and variations in the time that must elapse before jury review is available according to prior act rather than current mental state— these restrictions are hardly less arbitrary than the scheme held unconstitutional in Canada. Because the first proceeding is a critical procedural juncture of the magnitude we contemplated in *Franklin,* and access to the outpatient program "becomes the sine qua non to freedom—the key to the

---

[9]The lieutenant governor acts for the sovereign in her absence.

door" (*Barnes, supra,* 186 Cal.App.3d at p. 980 [dis. opn. of Poché, J.]), I cannot agree that the statutory scheme satisfies due process.

As the Court of Appeal herein reasoned, "Such commitments are, as we have seen frequently in the history of many countries, and occasionally our own, subject to misguided or malicious manipulation. Those confined for potentially lengthy periods in institutions populated with the criminally insane should be accorded a reasonable opportunity for periodic citizen review for this, if no other, reason." Without the opportunity for citizen review, it is conceivable that Tilbury could remain confined for a quarter of a century even though a jury would declare his fitness for supervised release, as has the medical director at Patton State Hospital. A becalmed ship sails not a league closer to land because the winds may someday blow; nor does Tilbury move an inch closer to freedom because a jury may theoretically hear him out someday during his 23-plus-year sentence.

The majority also declare that habeas corpus is a safeguard against abuse. I agree that habeas corpus is a substantial remedy. As Justice Poché observed in *Barnes,* however, judicial review of a judge's factual findings cannot replace the right to trial by jury. (186 Cal.App.3d at p. 979 [dis. opn. of Poché, J.].) A patient may feel greater freedom to argue before a jury that "the system" has meted out unfair treatment than before a perceivedly less sympathetic audience of professionals, be they judges or psychiatrists.[10]

## III

Because society is understandably ambivalent about releasing those who, though adjudged not guilty by reason of insanity, may have committed grave

---

[10]The majority conclude that the United States Supreme Court has decided that trial by judge is constitutionally sufficient when a person found not guilty by reason of insanity seeks outpatient status. (*Jones* v. *United States* (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043] (hereafter *Jones*).) I believe *Jones* is distinguishable.

*Jones* held that a patient found not guilty by reason of insanity was not constitutionally entitled, on equal protection grounds vis-a-vis civilly committed persons, to a jury at a hearing following 50 days of confinement. (463 U.S. at p. 362, fn. 10 [77 L.Ed.2d at p. 704].) But *Jones* does not weaken *Franklin.* The 50-day hearing in *Jones* served only to certify the patient's eligibility for eventual release (see *id.* at p. 357, fn. 3 [77 L.Ed.2d at p. 701]), and may be viewed as a prophylactic check on the jury's then-recent finding that the patient was insane at the time of the offense. The lower court in the *Jones* litigation viewed the hearing as part of the commitment itself rather than a postcommitment procedure, even though actual physical confinement would precede the hearing. (*Jones* v. *United States* (D.C. 1981) 432 A.2d 364, 373, fn. 19.) The federal high court stated that it did not decide whether the release procedures were constitutional. (463 U.S. at p. 363, fn. 11 [77 L.ed.2d at p. 704].) Thus, even if we agreed that the federal standard should be our own, in my view *Jones* does not support the proposition that Tilbury is not constitutionally entitled to a jury trial on the question of his eligibility for the supervised outpatient regime.

acts, a word is in order about the policy rationale behind having a jury decide fitness for release to supervised treatment in the community.

It must be stressed that there are few insanity acquittals. (See Morse, *Excusing the Crazy: The Insanity Defense Reconsidered, supra*, 58 So.Cal.L.Rev. 779, 832.) California's standard for a finding of insanity is stringent: in essence, a defendant must have lost touch with reality, for he or she must prove by a preponderance of the evidence an incapability "of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).) The People do not suggest that *Franklin*'s requirement of a jury trial has resulted in the release of patients who ought to have remained confined. Indeed, it is not unknown for the prosecution itself to demand jury review of a patient's mental state when the latter would prefer to be heard by a judge. (*Almond, supra*, 219 Cal.App.3d 607.) Jurors must be, and can be, trusted to know they are charged with a grave duty, and to carry out that duty soberly. Finally, there is no reason to believe that trial by jury imposes too great a burden on prosecutors' offices. A trial of the issue must take place every year in any event (§ 1026.2, subd. (j)); to have a jury decide the issue would not significantly increase the burden on judicial or prosecutorial resources.

In sum, I conclude that the Legislature did not intend to change existing law requiring a jury trial at the end of the initial treatment and evaluation period, and that access to a jury is constitutionally required. I therefore dissent.

**KENNARD, J.**—I dissent for the reasons expressed in parts II and III of Justice Mosk's dissenting opinion.