Filed 1/23/24  P. v. Pavelko CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096829 |
| Plaintiff and Respondent, | (Super. Ct. No. 04F09970) |
| v. | |
| VICTOR PAVELKO, | |
| Defendant and Appellant. | |

In 2005, the trial court found defendant Victor Pavelko not guilty by reason of insanity for three counts of assault with a deadly weapon (Pen. Code,[1] § 245, subd (a)(1)) with one allegation of great bodily injury (§ 12022.7).  As a result, he was committed to Napa State Hospital for a term not to exceed nine years.  Thereafter, the People obtained

---

[1]    Further undesignated section references are to the Penal Code.

further commitments of two years each (§ 1026.5, subd. (b)) in 2013, 2015, 2017, and 2019.

In 2021, the People moved to extend defendant's commitment an additional two years (§ 1026.5, subd. (b)), which defendant opposed. Before trial, defendant moved for a conditional placement in an outpatient program (§ 1026.2). Because the People maintained that a trial on defendant's section 1026.2 petition could not occur until after the extension petition had been decided, defendant agreed to extend his commitment an additional two years (§ 1026.5, subd. (b)) to November 11, 2023.[2]

Following a bench trial during which both parties presented evidence and argument, the trial court denied defendant's petition. Defendant now appeals arguing the phrase "danger to the health and safety of others" in section 1026.2 is unconstitutionally vague and overbroad, requiring this court to interpret the proscription of dangerousness in section 1026.2 using the dangerousness standard embodied in section 1026.5, subdivision (b). Defendant reasons under this more stringent standard that the trial court abused its discretion in denying his petition because the evidence in the record does not show the required link between defendant's dangerousness and his: (1) schizophrenia; (2) substance abuse; or (3) lack of insight/failure to complete the Napa State Hospital's discharge unit level. We discern no abuse of discretion, and accordingly, we will affirm.

BACKGROUND

In 1980, defendant was diagnosed with schizophrenia at the age of 25. On November 13, 2004, defendant repeatedly stabbed his roommate and two other residents at a board and care facility where they lived. Responding authorities located defendant holding a knife, which he had used to stab the three victims multiple times. Defendant

---

[2] In light of the People's reliance upon this procedure below, we deem forfeited the People's argument on appeal that the section 1026.2 procedure is unavailable to an individual whose commitment is extended pursuant to section 1026.5.

believed his roommate was "messing" with him by stealing his belongings and stabbed him nine times, including in the chest, arms, and base of the skull. Defendant failed to take his medication the day before because he was tired of waiting in line for it. He also drank alcohol before stabbing the victims. He believed his roommate had stolen $30 or $40 from him.

As noted, *ante*, defendant was found not guilty by reason of insanity of three counts of assault with a deadly weapon (§ 245, subd. (a)(1)) with one allegation of great bodily injury (§ 12022.7). He was committed to Napa State Hospital for a term not to exceed nine years. Thereafter, the People obtained orders extending his commitment to the hospital through November 2023.

A.    *Defendant's Evidence*

Dr. Douglas Korpi, a forensic psychologist and former conditional release program (CONREP) administrator, testified as an expert in "NGI assessment" as to defendant's appropriateness as a candidate for CONREP. He was retained by defendant's attorney and evaluated defendant in 2017, 2019, and 2021, ultimately concluding defendant could be safely supervised by CONREP. In evaluating defendant's appropriateness, Dr. Korpi considered: (1) write-ups and violent behavior at the hospital; (2) medication compliance; (3) the use of as-needed medications; and (4) insightfulness concerning defendant's mental illness and associated triggers. Dr. Korpi described the first three considerations as "incredibly important," while insightfulness was preferred, but not required.

As to the first factor, defendant had not been in physical fights since his admission to the hospital, but he did hit a dentist's door in 2009 or 2010 seeking medication and had many documented instances of non-overt "agitation" and "anger" since 2010, which could suggest that he is not stable. Further, defendant had a few write-ups in 2017, one of which was for possessing marijuana, which was concerning because of defendant's history of substance abuse (specifically alcohol and methamphetamine use disorders in

3

remission in a controlled environment).  Given that the write-up was five years old, it was less concerning than it might have been, but it still showed defendant had not learned the lesson of taking only his prescribed medications and staying away from other drugs.  Dr. Korpi opined that alcohol appeared "to have been a precursor to the criminal behavior in 2004."[3]  Further, because defendant was over 60 years old, he was much less likely to be violent.

As to the second factor, defendant was medication compliant, willingly taking clozapine.  In fact, defendant's behavior was unusual because he "always ask[s] . . . for more and more and more.  He wants to lay [*sic*] in bed and be zoned out."  Because of defendant's desire for more medications, the staff "stopped giving him as-needed meds because he was always asking for them just because he wanted to sleep more."  Even on medication, defendant continued to have breakthrough auditory hallucinations, but they were less frequent and intense.  These voices "say mean things to him" and sometimes he hears "women screaming," which can make it hard to concentrate, but the voices do not appear to have ever made him violent or threatening.

Further, as to the third factor, defendant's seeking as-needed medications did not concern Dr. Korpi because those medicines would make him sleepier, which would not increase the likelihood of him stabbing anyone.  Defendant did not need as-needed medications to keep him stable and was well controlled on his regimen of Clozapine and Depakote.  Nonetheless, defendant admitted to Dr. Korpi he had used drugs and alcohol in the past in an attempt to self-medicate his depression and drugs/alcohol were more readily available should defendant decide to self-medicate while at the board and care facility.  Dr. Korpi also acknowledged defendant had consistently sought to increase his prescription medication in 2019, 2020, and 2021.

---

[3]　　Specifically, Dr. Korpi acknowledged that defendant had stopped taking his medication and had been using drugs and/or alcohol prior to the 2004 stabbing.

Finally, concerning the fourth factor, defendant was not insightful because of his schizophrenia, cognitive impairment, and honesty, which kept him from parroting phrases which would make him appear "insightful." Defendant's preference for sedation over insight made him less safe than someone who had identified his or her triggers and had strategies to deal with them. Further, although defendant previously identified his paranoia as the underlying cause for the stabbing, he no longer held that belief.

If released, defendant would be placed in a board and care facility where he would have weekly group meetings and individual therapy, as well as monthly drug tests. He would see his psychiatrist every one to three months. Visits with mental health professionals would occur offsite. No one at the board and care facility is a mental health professional, but his drugs would be distributed to him daily. A board and care facility is "just a house," so security is not well maintained. Nonetheless, Dr. Korpi opined defendant would not present a risk of dangerousness if housed in a board and care facility because he has been stable and nonviolent at the hospital.

On cross-examination, Dr. Korpi conceded he had recommended release to CONREP in "the vast majority" of the section 1026.2 evaluations he had done in the past five years. Further, he acknowledged that one of the symptoms of schizophrenia is paranoia, and defendant's commitment offense included a belief his roommate was out to get him before stabbing him and two others who had intervened. While generally a loner at the hospital, at a board and care facility, defendant would be forced to interact with up to five roommates, with no professional onsite supervision. Finally, the kind of board and care facility defendant was seeking release into was exactly the kind of facility where he was housed when he stabbed his roommate.

B.    *The People's Evidence*

Dr. Jennifer Warring, a psychologist at Napa State Hospital, explained the hospital's goal for patients found not guilty by reason of insanity is to restore them to sanity for a safe return to the community. To that end, patients entering the hospital

5

move from the admission unit to a unit level where they are stabilized, then to a treatment unit, and finally to the discharge level unit. At the treatment phase, medication regimes are refined and individuals are allowed to have jobs. At the discharge phase, patients have good insight into their illnesses (including relapse risks), are refining their forensic relapse prevention plans, and are on stable medication regimens. While the hospital is a locked facility, patients in the treatment and discharge units are afforded more freedoms. Nonetheless, nurses, psychologists, doctors, and other necessary staff are all onsite and available to assist patients around the clock.

Dr. Warring had treated defendant for approximately six months and observed he attended groups, despite health difficulties,[4] but was unable to complete the homework associated therewith. Defendant was housed in the treatment unit and to advance to the discharge unit level, he needed to participate more actively in groups and re-engage with the substance recovery group. Dr. Warring believed defendant was still dangerous.

Brittany Lopez, a forensic mental health specialist with Central Valley CONREP, evaluated defendant for his suitability for placement at a CONREP board and care facility. Given the freedoms of a board and care facility, CONREP looks for insight and judgment in order to determine whether an individual is appropriate for community placement. Notably, defendant was uncomfortable discussing his commitment offense with Lopez, failed to identify any triggers leading to the offense, and denied that his mental illness "didn't have a lot to do" with that offense. This created "a huge concern" and presented a "heightened risk" because if an individual failed to understand how his mental illness contributed to the commitment offense, CONREP would have a more difficult time preventing re-offense. This was especially true because defendant's violent commitment offense had occurred at a board and care facility, the same level of care he

---

[4]     Defendant experiences shortness of breath when standing and walking.

6

was seeking to be released into.  Accordingly, Lopez did not recommend he could be safely maintained at a CONREP board and care facility.

Dr. Sabina Correa, a forensic psychologist, testified as an expert regarding forensic psychology and possible outpatient treatment.  Dr. Correa evaluated defendant's suitability for outpatient placement under section 1026.2.  In so doing, she reviewed various materials concerning defendant and interviewed him, although defendant terminated the interview prematurely after 30 to 45 minutes because he did not want to discuss the commitment offense.  Dr. Correa identified numerous historical risk factors including defendant's history of violence, his poor response to treatment, his lack of a support network, his significant substance abuse history, and his limited work history.  Historical risk factors are important because they are the "best predictor" of future behavior.  Defendant's history of violence included his three assaults comprising the commitment offense, as well as other arrests and convictions for battery and substance abuse.  Substance abuse is concerning because it could be a way of coping, acting as a disinhibitor that could cause a person to act violently or with poor judgment, and in the case of schizophrenia, could cause rapid decompensation.

Further, Dr. Correa was concerned about defendant's lack of insight and his breakthrough symptoms despite aggressive medication.  While defendant demonstrated some level of understanding between his mental health disorder, related symptoms, his medication, and substance abuse, it was not a level of understanding appropriate for discharge.  Defendant's seeking increased dosages of his prescribed medications also presented a concern regarding his possible substance abuse.  Further, while the hospital had a discharge unit in which patients would be afforded more freedoms and the opportunity to practice skills necessary for a community level of treatment, defendant had not been recommended for discharge. Participation in the discharge unit level is important because it allows the hospital and CONREP to connect defendant with support in the community such as Alcoholics Anonymous and an individual therapist.  When

7

asked whether defendant could be safely placed "without presenting a danger to the health and safety of others due to a mental defect, disease, or disorder," Dr. Correa opined defendant was not ready for discharge to CONREP.

C.     *The Court's Ruling*

The trial court began its ruling highlighting that in the section 1026.2 context, the law presumed defendant currently posed a danger to the health and safety of others as a result of mental disease, defect, or disorder and that it was defendant's burden to prove otherwise by a preponderance of the evidence. The court then commended defendant on his treatment progress, but ultimately concluded he had not met his burden for placement at CONREP. Specifically, the court was concerned with defendant's lack of insight (including his refusal to discuss the commitment offense with two evaluators), his breakthrough symptoms (and history of substance abuse and seeking nonprescription drugs—including at the hospital), and his failure to be placed in and complete the discharge unit level at Napa State Hospital wherein he could demonstrate his suitability for outpatient placement and treatment.

DISCUSSION

Defendant complains the phrase "danger to the health and safety of others" in section 1026.2 is unconstitutionally vague and overbroad, requiring that this court review the denial of his petition using the dangerousness standard as embodied in section 1026.5, subdivision (b). Utilizing that stricter standard, defendant posits the trial court abused its discretion when it denied his section 1026.2 petition. We disagree.

A.     *Background*

"A person who has been found not guilty by reason of insanity and committed to a state hospital may apply to the superior court for release from commitment 'upon the ground that sanity has been restored.' (§ 1026.2, subd. (a).) In 1984, the Legislature amended section 1026.2 to 'require that a committed person spend one year as a supervised outpatient before applying for a sanity-restoration hearing' to obtain

8

unconditional release. (*People v. Tilbury* (1991) 54 Cal.3d 56, 62.) The statute now 'involves what has been described as a two-step process.' " (*People v. Nance* (2022) 78 Cal.App.5th 784, 787-788.)

"The first step is an outpatient placement hearing, at which the applicant must prove by a preponderance of the evidence that he or she will not be 'a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community.' (§ 1026.2, subds. (e), (k).) If the court makes this finding, the applicant is 'placed with an appropriate forensic conditional release program for one year.' (§ 1026.2, subd. (e).)" (*People v. Diggs* (2022) 80 Cal.App.5th 702, 709 (*Diggs*).)

" 'The second step in the section 1026.2 release process is referred to as the restoration of sanity trial, and can only be reached if the applicant has already met the threshold test for placement in "an appropriate forensic conditional release program." ' [Citation.] The applicant again bears the burden to prove by a preponderance of the evidence that he or she will not be a danger due to mental defect, disease, or disorder. (§ 1026.2, subds. (e), (k).)" (*Diggs*, *supra*, 80 Cal.App.5th at p. 709.)

It is the first step that we are concerned with in this appeal.

B.      *Constitutionality*

Section 1026.2, subdivision (e) provides in pertinent part, "The court shall hold a hearing to determine whether the person applying for restoration of sanity would be *a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community.* If the court at the hearing determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community, the court shall order the applicant placed with an appropriate forensic conditional release program for one year." (Italics added.)

Defendant argues that the Legislature's failure to define "danger to the health and safety of others" renders the text vague and overbroad unless we import the danger standard embodied in section 1026.5, subdivision (b) for recommitments after exhaustion of the maximum term of confinement. We are not persuaded.

Whether an applicant represents a "danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community" has a meaning that is readily ascertainable. (See *People v. Deskin* (1992) 10 Cal.App.4th 1397, 1400 [a statute with "vague or general . . . language because of difficulty in defining the subject matter with precision . . . will be upheld if its meaning is reasonably ascertainable"].) Indeed, it is a fact-specific inquiry that has been applied without difficulty since its addition to the Penal Code in 1980. (Stats. 1980, ch. 547, § 3; see, e.g., *People v. Cross* (2005) 127 Cal.App.4th 63; *People v. Bartsch* (2008) 167 Cal.App.4th 896.)

Defendant posits that the statutory proscription sweeps in dangers ranging from serious criminal activity to relatively benign actions like refusing a vaccination. However, it is not illegal to decline a vaccine, and there is no suggestion that an applicant's hypothetical noncriminal conduct would implicate the dangerousness proscription found in section 1026.2. Accordingly, defendant has not shown the dangerousness proscription in section 1026.2 is unconstitutional merely because noncriminal conduct could be considered dangerous in a general sense.

C. *Defendant's Remaining Arguments*

We also reject defendant's suggestion that we must interpret the dangerousness proscription in section 1026.2 as implicating only behavior representing a *physical* danger as embodied in section 1026.5, subdivision (b). As recognized in *People v. Woodson* (1983) 140 Cal.App.3d 1, 4, while everyone committed pursuant to section 1026 is insane, only a subset of those individuals represents a danger of physical harm to others, and only those individuals are subject to recommitment proceedings

10

under section 1026.5, subdivision (b). Accordingly, *Woodson* refused to apply the physical danger requirement from section 1026.5, subdivision (b) in section 1026.2 proceedings. (*Woodson*, at pp. 4-5.)

Defendant's reliance on the section 1026.5, subdivision (b) physical dangerousness proscription also ignores the procedural stance of his case. Unlike a section 1026.5 proceeding wherein the People have the burden of proving defendant represents " 'a substantial danger of physical harm to others' . . . and has 'serious difficulty controlling his [or her] potentially dangerous behavior" beyond a reasonable doubt (*People v. Cheatham* (2022) 82 Cal.App.5th 782, 789), in a section 1026.2 inquiry, the law *presumes* the applicant is a danger to the health and safety of others as a result of a mental disease, defect, or disorder. (CALCRIM No. 3452; see also *In re Franklin* (1972) 7 Cal.3d 126, 141 [interpreting precursor statute].) It therefore was incumbent on defendant to prove by a preponderance of evidence that he was *not* "a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community."[5] (§ 1026.2, subds. (e), (k).)

It is this procedural distinction that renders defendant's reliance on *People v. Cheatham*, *supra*, 82 Cal.App.5th at page 782, *People v. Redus* (2020) 54 Cal.App.5th 998, *People v. Johnson* (2020) 55 Cal.App.5th 96, and *People v. Jenkins* (2023) 95 Cal.App.5th 145 inapposite. None of these cases concerns a trial court's exercise of discretion in a section 1026.2 context, and we decline defendant's invitation to import section 1026.5, subdivision (b)'s requirements into the section 1026.2 inquiry. (*People v. Woodson*, *supra*, 140 Cal.App.3d at p. 4.) If defendant believed section 1026.5,

---

**5**      It is well established that allocating the burden of proof in this manner does not violate the Constitution. (*Jones v. United States* (1983) 463 U.S. 354, 366-368.) We nonetheless recognize that if defendant was no longer mentally ill, the justification for requiring him to prove that he was no longer a danger to society would no longer exist. (See *Foucha v. Louisiana* (1992) 504 U.S. 71, 78-84.) That is not the case here.

subdivision (b)'s requirements were no longer met, his recourse was to have a trial on that issue. Having stipulated to an additional two-year commitment prior to his section 1026.2 hearing, we will not entertain a challenge to whether the section 1026.5, subdivision (b) requirements were met.

Having determined that we will review the trial court's denial of defendant's section 1026.2 petition under established legal parameters, we discern no abuse of discretion. (*People v. Bartsch, supra*, 167 Cal.App.4th at p. 900; *People v. Dobson* (2008) 161 Cal.App.4th 1422, 1433.) " 'The term judicial discretion implies the absence of arbitrary determination, capricious disposition, or whimsical thinking. [Citation.] "When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge. [Citation.]" [Citation.] Discretion is abused only if the court exceeds all bounds of reasons, all of the circumstances being considered.' " (*Diggs*, *supra*, 80 Cal.App.5th at p. 709.)

Here, the trial court found defendant had not met his burden of demonstrating by a preponderance of the evidence that he would not be a danger to the health and safety of others as a result of mental disease, defect, or disorder if placed through CONREP. In making this determination, the court highlighted concerns about defendant's lack of insight (including his refusal to discuss the commitment offense with two evaluators), his breakthrough symptoms (and history of substance abuse and seeking nonprescription drugs—including at the hospital), and his failure to be placed on and complete the discharge unit level at Napa State Hospital wherein he could demonstrate his suitability for outpatient placement and treatment. We find each of these concerns supported by evidence in the record as recounted above. Further, defendant has not shown the trial court's utilization of these specific criteria was an abuse of discretion. (See *People v. Bartsch*, *supra*, 167 Cal.App.4th at pp. 900-903 [trial court did not abuse its discretion in

12

determining mentally ill petitioner whose substance abuse was in remission was not ready for outpatient release as confirmed by his treating clinicians].)  On the contrary, these factors directly informed whether defendant was at risk of decompensating and reoffending if released to a board and care facility.  We cannot substitute our judgment in determining whether the trial court might have reached a different decision on the information before it.  (*Diggs*, *supra*, 80 Cal.App.5th at p. 709.)  Accordingly, we must affirm.

## DISPOSITION

The trial court's order denying defendant's section 1026.2 petition is affirmed.


_____\s\_____,
                    Krause, J.



We concur:



_____\s\_____,
Robie, Acting P. J.



_____\s\_____,
Mauro, J.